**John F. "Jack" WALSH, et al., Plaintiffs,**

v.

**FORD MOTOR COMPANY, Defendant.**

Civ. A. No. 81–1998.

United States District Court, District of Columbia.

May 9, 1985.

Beverly C. Moore, Jr., Law Offices of Beverly C. Moore, Jr., Landon Gerald Dowdey, Law Offices of Landon Gerald Dowdey, Washington, D.C.; Wallace J. Smith and Ben Schiebel, Wallace J. Smith, Inc., Sacramento, Cal.; Barry Schwartz, Wolf, Block, Schorr and Solis-Cohen, Philadelphia, Pa.; William H. McDonald, David A. Childers, John E. Price and Robert M.N. Palmer, Woolsey, Fisher, Whiteaker, McDonald & Ansley, Springfield, Mo., for plaintiffs.

William T. Coleman, Jr., Richard C. Warmer, Carl R. Schenker, Jr. and John H. Beisner, O'Melveny & Myers, Washington, D.C., for defendant; Henry R. Nolte, Jr., James M. MacNee, Ford Motor Co., Dearborn, Mich., of counsel.

## TABLE OF CONTENTS

BACKGROUND OF THIS LITIGATION ...................................385

APPLICABILITY OF RULE 23 TO MAGNUSON–MOSS ...................386

CLASS CERTIFICATION IN GENERAL.................................387

PLAINTIFFS' IMPLIED WARRANTY CLASS ...........................388

 I. The Prerequisites of Rule 23(a)......................................389
 A. Numerosity ...................................................389
 B. Common Questions of Law or Fact...............................389
 C. Typicality of Class Representatives' Claims and Defenses with the Entire Class—Protected Interests of the Class .....................390
 D. Adequacy of Representation ....................................391

 II. The Requirements of Rule 23(b) ....................................391
 A. Rule 23(b)(2) .................................................391
 B. Rule 23(b)(3) .................................................392
 1. Predomination in General ..................................392
 2. "Difference-in-Value" Claims of All Owners for Breach of Implied Warranty .............................................393
 a. Existence of Class-wide Proof............................394
 b. State Law Variations....................................395
 c. Damages for All-Owners Class............................396
 d. Viability of Asserting an All-Owners Difference-in-Value Group 396
 e. Individual Interests, Manageability, and Superiority Concerns 397
 3. Incidents Group for Claims of Breach of Implied Warranty .....398
 a. Satisfying the Predomination Requirement..................398
 b. Plaintiffs' Suggested Presumption Argument ...............399
 c. Questions of Manageability ..............................402

PLAINTIFFS' WRITTEN WARRANTY CLASS ...........................403

PLAINTIFFS' PERSONAL INJURY CLASS .............................404

PLAINTIFFS' PUNITIVE DAMAGES CLASS ...........................406

NOTICE .........................................................409

 I. The Issue of Individual Notice in Magnuson-Moss Class Actions........409
 II. Constitutional Due Process Considerations of Notice ...................412

CONCLUSION.....................................................414

## OPINION

**JUNE L. GREEN, District Judge.**

This matter is before the Court on plaintiffs' motion for class certification, opposition thereto, numerous supplemental memoranda from both parties, and oral argument on the motion. For the reasons set forth below in detail, the Court certifies a number of classes proposed by plaintiffs, but also declines to certify other proposed classes. Attached to this memorandum opinion is an order setting forth those classes which the Court has conditionally certified pursuant to Rule 23 of the Federal Rules of Civil Procedure ("Rule 23") and the class-action provisions of the Magnu-

son-Moss Warranty Act, 15 U.S.C. § 2310 ("Magnuson-Moss" or the "Act").

Plaintiffs brought this action seeking damages, declaratory and injunctive relief for breach of written and implied warranty, strict tort liability, and negligence because of allegedly defective automatic transmissions in certain types of motor vehicles manufactured by defendant, Ford Motor Company ("Ford"). The complaint alleges that defendant's 1976–1979, as well as certain 1980 model motor vehicles with FMX, C–3, C–4, or C–6 automatic transmissions, may slip into the reverse position while not being placed there by the driver.[1] The complaint alleges claims for breach of implied and written warranties under the Act, as well as State law claims for breach of express and implied warranty, strict tort liability, and negligence for personal injuries and "other claims" in excess of $10,000.

Plaintiffs seek to certify the following classes:

CLASS I—*Implied Warranty Incidents*, pursuant to Rule 23(b)(3):

All purchasers or owners (other than for purposes of resale) of 1976–1979 and 1980 pre-design change model year Ford vehicles equipped with an FMX, C–3, C–4, or C–6 automatic transmission seeking recovery of property damages incurred as a result of a Ford park-to-reverse incident, but excluding such persons who purchased such Ford vehicles

(a) in (i) Alabama, Arizona, Connecticut, Illinois, Indiana, New Jersey, New York, Ohio, Washington, or Wisconsin or (ii) second hand in California or Georgia, or

(b) prior to August 21, 1977 and did not experience a park-to-reverse incident prior to November 2, 1977.

CLASS II—*Written Warranty Incidents*, pursuant to Rule 23(b)(3):

All purchasers or owners (other than for purposes of resale) of 1976–1979 and 1980 pre-design change model year Ford vehicles equipped with an FMX, C–3, C–4, or C–6 automatic transmission seeking recovery of property damages incurred as a result of a Ford park-to-reverse incident occurring within the 12,000 mile/12 month written warranty period about which they complained to Ford or a Ford dealer within a reasonable time thereafter, but excluding such persons who purchased such Ford vehicles prior to August 21, 1977, and did not experience a park-to-reverse incident prior to November 2, 1977.

CLASS III—*All Owners Difference in Value Damages*, pursuant to Rule 23(b)(3):

All owners (other than for purposes of resale) of 1976–1979 and 1980 pre-design change model year Ford vehicles equipped with an FMX, C–3, C–4, or C–6 automatic transmission seeking recovery of damages equal to the difference in value between those transmissions as received and those transmissions as warranted, but excluding such persons who purchased such Ford vehicles prior to August 21, 1977 and did not experience a park-to-reverse incident prior to November 2, 1977, and including the following subclasses of such Ford owners who actually experienced a Ford park-to-reverse incident:

(a) all persons described in Class I without limitation as to whether the incident resulted in property damage, and

(b) all persons described in Class II without limitation as to whether the incident resulted in property damage.

CLASS IV—*All Owners Recall/Retrofit Equitable Relief*, pursuant to Rule 23(b)2) [sic]:

All owners (other than for purposes of resale) of 1976–1979 and 1980 pre-design change model year Ford vehicles equipped with an FMX, C–3, C–4, or C–6

---

**1.** The parties have described this phenomenon in numerous ways; *e.g.*, "park-to-reverse incidents," "unexpected vehicle movement," and "jump-out-of-park" incidents. The Court, for lack of a better, easily defined term, and for purposes of this opinion, shall use the expression "park-to-reverse" incidents to describe this occurrence.

automatic transmission seeking the equitable relief of (i) recall and retrofit of those transmissions to remedy design defects or (ii) the issuance of extended written warranties covering all damage (other than for personal injuries) resulting from future park-to-reverse incidents, but excluding such persons who purchased such Ford vehicles prior to August 21, 1977 and did not experience a park-to-reverse incident prior to November 2, 1977, and including the following subclasses of such Ford owners who actually experienced a Ford park-to-reverse incident:

(a) all persons described in Class I without limitation as to whether the incident resulted in property damage, and

(b) all persons described in Class II without limitation as to whether the incident resulted in property damage.

CLASS V—*Personal Injury Incidents—Declaratory Judgment on Common Liability Issues*, pursuant to Rule 23(b)(3):

All purchasers or owners (other than for purposes of resale) of 1976–1979 and 1980 pre-design change model year Ford vehicles equipped with an FMX, C–3, C–4, or C–6 automatic transmission, including family or household members entitled to enforce Ford's written or implied warranties pursuant to UCC § 2–318, who were seriously injured in person (*i.e.*, who claim personal injury, property, and/or punitive damages exceeding $10,-000) as a result of such Ford vehicle's park-to-reverse incident, certification of this class to be limited to the common liability issues to be litigated with respect to Classes I and II, and including the following subclasses of such persons:

(a) all persons described in Class II without limitation as to whether the incident resulted in property damage, the date of the vehicle's purchase, or the date of the incident,

(b) all persons described in Class I without limitation as to whether the incident resulted in property damage, the date of the vehicle's purchase, or the date of the incident, but including such Ford vehicles purchased in Connecticut, Ohio, Indiana, or Washington, and

(c) all persons injured by such incidents in the states of Alabama, Arizona, Illinois, New Jersey, New York, or Wisconsin, which persons assert strict product liability claims.

CLASS VI—*Punitive Damage Incidents:*

All members of Classes I, II, or V and including the following subclasses of such persons:

(a) pursuant to Rule 23(b)(3), all such persons claiming punitive damages directly under the Magnuson-Moss Act, and

(b) pursuant to Rule 23(b)(1)(B), all such persons, except those whose injuries occurred or whose Ford vehicles were purchased in Washington, Louisiana, Massachusetts, Connecticut, and Michigan, claiming punitive damages under state law, with further subclasses defined as necessary according to

(i) whether the person asserts a warranty, strict products liability or negligence claim, and

(ii) whether the applicable state standard for an award of punitive damages is gross negligence or willful misconduct.

Plaintiffs' Proposed Class Certification Order, June 13, 1984. Plaintiffs' proposed Class III and Class IV are pursued in the alternative. Further, plaintiffs state that if the Court were not inclined to certify the "all owners" categories in proposed Class III or Class IV, these classes could be limited to only those plaintiffs who experienced park-to-reverse incidents. Plaintiffs' Memorandum on Class Certification Order at 30 n. 20.

In order to address adequately plaintiffs' class certification motion, the Court first must review some of the history of this litigation.

BACKGROUND OF THIS LITIGATION [2]

On March 14, 1984, this Court denied Ford's motion to dismiss the second amended complaint. *See Walsh v. Ford Motor Co.*, 588 F.Supp. 1513 (D.D.C.1984). In the memorandum opinion accompanying that decision, the Court examined closely the question of whether plaintiffs had satisfied the strict jurisdictional requirements of the Act.[3] Specifically, the Court examined each and every named plaintiff to determine whether that plaintiff was able to state a claim for relief and, therefore, could be counted toward satisfying the 100-named plaintiff requirement which is necessary in order to bring a class action under Magnuson-Moss. *See* 15 U.S.C. § 2310(d)(3)(C).

Despite plaintiffs' protestations, the Court, in counting plaintiffs, refused to recognize claims of joint owners or duplicative and triplicative plaintiffs to satisfy the 100-named plaintiff jurisdictional requirement of the Act. *Walsh v. Ford Motor Co.*, 588 F.Supp. at 1521. The Court also examined whether these named plaintiffs sufficiently alleged fraud and due diligence in order to toll the statute of limitations. *Id.* at 1521–24. It further looked to the law of thirteen states to examine whether those states required the presence of vertical privity to pursue claims for breach of implied warranty. *Id.* at 1524–35. Finally, the Court limited written warranty claims to those named plaintiffs who alleged transmission malfunctions within the warranty period.[4] *Id.* at 1535–36. After making determinations on these issues, the Court concluded that of the 210 plaintiffs originally named in the second amended complaint, only 106-named plaintiffs remained to satisfy the Act's jurisdictional requirement.[5] *Id.* at 1536.

Throughout the briefing on defendant's motion to dismiss the second amended complaint, plaintiffs insisted that the Act does not require the scrutiny the Court deemed necessary. The Court reasoned that a close "merits" evaluation was required by the Act before a court could determine whether it had jurisdiction. *See Walsh v. Ford Motor Co.*, 588 F.Supp. at 1519–21.

This conclusion is supported by the language of the Act, as well as its legislative history. As noted by this Court, "where 'the jurisdiction of Federal courts ... has been narrowed by ... acts of Congress ... the statute calls for its strict construction.'" *Id.* at 1520 (quoting *Healy v. Ratta*, 292 U.S. 263, 270, 54 S.Ct. 700, 703, 78 L.Ed. 1248 (1934)). Congress evinced an intent to narrow strictly a Federal court's jurisdiction in order "to avoid trivial or insignificant actions being brought as class actions in the federal courts." H.R.Rep. No. 93–1107, 93d Cong., 2d Sess. ("House Committee Report"), *reprinted in* 1974 U.S.Code Cong. & Ad.News 7702, 7724; *see*

---

**2.** For a more complete history of this litigation see the Court's opinion in *Walsh v. Ford Motor Co.*, 588 F.Supp. 1513 (D.D.C.1984).

**3.** The Act requires the following jurisdictional prerequisites to be met before a case may be brought in Federal court:

No claim shall be cognizable in a suit brought [in an appropriate district court of the United States] ...

(A) if the amount in controversy of any individual claim is less than the sum or value of $25;

(B) if the amount in controversy is less than the sum or value of $50,000 (exclusive of interests or costs) computed on the basis of all claims to be determined in this suit; or

(C) if the action is brought as a class action, and the number of named plaintiffs is less than one hundred.

15 U.S.C. § 2310(d)(3).

**4.** During the course of briefing for this present motion plaintiffs noted that Judge Jackson in *Alberti v. General Motors Corp.*, 600 F.Supp. 1026 (D.D.C.1985), a Magnuson-Moss class action, upheld written warranty claims under the "latent defect" theory. This Court, in its opinion of March 14, 1984, rejected this theory. *See Walsh v. Ford Motor Co.*, 588 F.Supp. at 1535–36. Given Judge Jackson's reasoning in *Alberti*, the Court is prepared to reconsider its conclusions as to the written warranty limitations, but will defer a decision on this issue until a proper motion and briefing are presented.

**5.** On April 13, 1984, the Court amended its opinion of March 14, 1984, and dismissed the Magnuson-Moss claims of four additional plaintiffs, thereby reducing the total number of named plaintiffs to 102. *See Walsh v. Ford Motor Co.*, 592 F.Supp. 1359 (1984).

*also Consumer Warranty Protection—1973; Hearings on H.R. 20 and H.R. 5021 Before the Subcomm. on Commerce and Finance of the House Comm. on Interstate and Foreign Commerce,* 93d Cong., 1st Sess. at 63 (Comm.Print 1973) (comment by Rep. Broyhill stating concern with overburdening the Federal court system).

■ It is plain, however, that once jurisdiction has attached in Federal court, the Act must be interpreted reasonably in order to ensure that its purposes are implemented. As the House Committee noted, once "the conditions of th[e] [jurisdictional] section are met by a class of consumers damaged by a failure to comply with a warranty ... Section 110(d) [15 U.S.C. § 2310(d)] should be construed reasonably to authorize the maintenance of a class action." House Committee Report, *reprinted in* 1974 U.S.Code Cong. & Ad. News at 7724. This apparent liberal application of class-action requirements under the Act in contrast to its strict jurisdictional requirements, creates a balance between the intent of Congress to provide a Federal forum whereby plaintiffs can pursue nationwide class actions against companies which violate the Act or breach warranties and Congress' concern about overburdening Federal courts with trivial, insignificant actions.

This Court has construed strictly the jurisdictional prerequisite of Magnuson-Moss as outlined in section 110(d). *See Walsh v. Ford Motor Co.,* 588 F.Supp. 1513. It must now address the issue of class certification, keeping in mind that the private enforcement and class action provisions of the Act are "remedial in nature and ... designed to facilitate relief which would otherwise not be available as a practical matter for individual consumers." House Committee Report, *reprinted in* 1974 U.S. Code Cong. & Ad.News at 7724.

### APPLICABILITY OF RULE 23 TO MAGNUSON–MOSS

■ In determining whether a class may be certified, Federal courts must follow Rule 23 of the Federal Rules of Civil Procedure. It is applicable in all actions, absent a "direct expression" by the Congress to the contrary. *Califano v. Yamasaki,* 442 U.S. 682, 700, 99 S.Ct. 2545, 2557, 61 L.Ed.2d 176 (1979). Although the Supreme Court in *Yamasaki* does not state where it may find a "direct expression" of intent to modify the applicability of the Federal rules, the Supreme Court's opinion in *Trbovich v. United Mine Workers,* 404 U.S. 528, 532–36, 92 S.Ct. 630, 633–35, 30 L.Ed.2d 686 (1972), suggests that this direct expression may be found in the legislative history of the Act.

Some commentators have argued that Rule 23 may not apply at all to Magnuson-Moss. *See* Comment, *The Magnuson-Moss Class Action Provisions: Consumers' Remedy or an Empty Promise,* 70 Geo. L.J. 1399, 1409–10 (1982) ("Comment, *Magnuson-Moss Class Action Provisions*"); Reitz, Curtis R., *Consumer Protection Under the Magnuson-Moss Warranty Act* at 99–100 (1978) ("*Reitz*"). They reason that because section 110 of the Act only makes reference to that portion of Rule 23 addressing the representative capacity of named plaintiffs, the remaining portions of the Rule do not apply to Magnuson-Moss. As one commentator noted:

If the statute made no mention of rule 23 it would appear that Congress had intended that the usual rule 23 standards govern Magnuson-Moss Act class actions. Yet by expressly indicating that rule 23 applies in a specific circumstance, Congress implied that *in general* rule 23 should not apply to Magnuson-Moss Act suits. Such an interpretation regarding rule 23 as inapplicable, except in provisions in which it is explicitly incorporated, would not render superfluous the two specific references to rule 23. Further, such an interpretation would preserve Congress' apparent intent ... to give consumers an opportunity to bring a type of class action not already available to them in typical rule 23 class actions.

Comment, *Magnuson-Moss Class Action Provisions,* 70 Geo.L.J. at 1409 (footnotes omitted) (emphasis in original). *See also*

*Reitz* at 100 ("This inference [of the Rule's inapplicability except where specifically referred to] is buttressed by the Act's requirement of at least 100 named plaintiffs with claims representing a minimum of $2,500 [sic] [6] out of a total of $50,000 or more. Such specific conditions displace the more general prerequisites of Rule 23(a), which indicate how numerous a class must be and what proportion may represent the whole.") *But see In Re General Motors Corp. Engine Interchange Litigation,* 594 F.2d 1106, 1135 n. 50 (7th Cir.), *cert. denied,* 444 U.S. 870, 100 S.Ct. 146, 62 L.Ed.2d 95 (1979) ("The explicit mention of the applicability of Rule 23 bolsters our conclusion that [the] Rule ... is applicable to class actions maintained under the Act.").

■ The Court will not read section 110 so broadly as to have it supersede the Rule 23 class action provision. It will, instead, apply Rule 23 where it is consistent with the terms and intent of Magnuson-Moss. *Cf. Weems v. McCloud,* 619 F.2d 1081, 1094 (5th Cir.1980) ("the Federal Rules of Civil Procedure are frequently applied less strictly in special statutory proceedings, where strict application of the rules would frustrate the statutory purpose"); *Usery v. District No. 22, United Mine Workers of America,* 567 F.2d 972, 975 (10th Cir.1978) (to permit intervention pursuant to Rule 24(a) of the Federal Rules of Civil Procedure in a suit brought by the Secretary of Labor under Title IV of the Labor Management Reporting Act of 1959, 29 U.S.C. § 482(b), would be "out of harmony with the fundamental purposes ... of the Act"); *Wright v. Stone Container Corp.,* 524 F.2d 1058, 1061–62 (8th Cir.1975) ("Rule 23 should be liberally construed to effectuate the remedial policy of Title VII").

## CLASS CERTIFICATION IN GENERAL

■ When determining whether it should grant certification to a class of plaintiffs, a court must not delve into the merits of the action. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 2152–53, 40 L.Ed.2d 732 (1974); *Blackie v. Barrack,* 524 F.2d 891, 901 (9th Cir.1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976). A court is obliged to determine only whether the requirements of Rule 23 have been satisfied. *See Chestnut Fleet Rentals, Inc. v. Hertz Corp.,* 72 F.R.D. 541, 543 (E.D.Pa.1976) ("[T]he central issue raised in a motion for certification is whether a class action is appropriate, not the probability of plaintiffs' success on the merits of the substantive claim.") (citing *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732); *Kahan v. Rosenstiel,* 424 F.2d 161, 169 (3d Cir.), *cert. denied,* 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970).

■ The question of whether a class may be certified is left to the discretion of the district court. *See, e.g., Gulf Oil Co. v. Bernard,* 452 U.S. 89, 100, 101 S.Ct. 2193, 2200, 68 L.Ed.2d 693 (1981). Further, Rule 23 determinations are made in a nonadversarial context. *McCarthy v. Kleindienst,* 741 F.2d 1406, 1421 (D.C.Cir.1984) (Mikva, J., concurring in part and dissenting in part). A court must determine, pursuant to the provisions of Rule 23, whether plaintiffs' cause of action is suitable for resolution on a classwide basis. *Id.* at 1412 n. 6; *see also Coopers & Lybrand v. Livesay,* 437 U.S. 463, 469 n. 12, 98 S.Ct. 2454, 2458 n. 12, 57 L.Ed.2d 351 (1978).

■ In making the certification determination in this case the Court also must be mindful that any certification determination is conditional and may be altered, expanded, subdivided, or vacated as the case begins to progress toward an actual merits determination. *See* Fed.R.Civ.P. 23(c)(1), 23(c)(4)(B).[7] The Court must also examine

---

**6.** Title 15, United States Code, section 2310(d)(3) requires that each individual's claim must be equal to or exceed the amount of $25, not $2,500, if the action is to be brought in Federal court.

**7.** Rule 23(c)(1) of the Federal Rules of Civil Procedure provides in pertinent part: "An order [granting class certification] may be conditional, and may be altered or amended before the decision on the merits." Rule 23(c)(4)(B) pro-

issues of class certification against the backdrop of Magnuson-Moss and Congress' intent to provide class actions as a form of recovery to consumers for breach of written and implied warranty.

As noted *supra*, plaintiffs seek to certify numerous classes in this action against Ford. Because plaintiffs have characterized their implied warranty claims as the "core" class in this action and because most of the issues raised in the class certification motion can be adequately addressed in the context of Magnuson-Moss claims for breach of implied warranty, the Court first will address extensively the certification questions in the implied warranty context. After addressing the implied warranty class certification questions, the Court then will address the remaining classes which plaintiffs seek to have certified and examine any additional stumbling blocks that might prevent certification of those groups. Finally, the Court will address the question of notice, including the kind of notice required for the classes which have been certified. For the sake of clarity the Court will restate what plaintiffs seek to have certified, as it addresses the various proposed classes.

## PLAINTIFFS' IMPLIED WARRANTY CLASS

Plaintiffs seek to certify the following class for breach of implied warranty under Magnuson-Moss:

> *Implied Warranty Incidents*, pursuant to Rule 23(b)(3):
>
> All purchasers or owners (other than for purposes of resale) of 1976–1979 and 1980 pre-design change model year Ford vehicles equipped with an FMX, ·C–3, C–4, or C–6 automatic transmission seeking recovery of property damages incurred as a result of a Ford park-to-reverse incident, but excluding such persons who purchased such Ford vehicles
>> (a) in (i) Alabama, Arizona, Connecticut, Illinois, Indiana, New Jersey, New York, Ohio, Washington, or Wisconsin or (ii) second hand in California or Georgia, or
>> (b) prior to August 21, 1977 and did not experience a park-to-reverse incident prior to November 2, 1977.

Plaintiffs' Proposed Class Certification Order, June 13, 1984. Within this implied warranty group plaintiffs also seek to certify the following classes alternatively:

> *All Owners Difference in Value Damages*, pursuant to Rule 23(b)(3):
>
> All owners (other than for purposes of resale) of 1976–1979 and 1980 pre-design change model year Ford vehicles equipped with an FMX, C–3, C–4, or C–6 automatic transmission seeking recovery of damages equal to the difference in value between those transmissions as received and those transmissions as warranted, but excluding such persons who purchased such Ford vehicles prior to August 21, 1977 and did not experience a park-to-reverse incident prior to November 2, 1977, and including the following subclasses of such Ford owners who actually experienced a Ford park-to-reverse incident:
>> (a) all persons described in [the implied warranty incidents group] without limitation as to whether the incident resulted in property damage....

or

> *All Owners Recall/Retrofit Equitable Relief*, pursuant to Rule 23(b)2) [sic]:
>
> All owners (other than for purposes of resale) of 1976–1979 and 1980 pre-design change model year Ford vehicles equipped with an FMX, C–3, C–4, or C–6 automatic transmission seeking the equitable relief of (i) recall and retrofit of those transmissions to remedy design defects or (ii) the issuance of extended written warranties covering all damage (other than for personal injuries) resulting from future park-to-reverse incidents, but excluding such persons who purchased such Ford vehicles prior to Au-

vides in pertinent part: "a class may be divided into subclasses and each subclass treated as a class...."

gust 21, 1977 and did not experience a park-to-reverse incident prior to November 2, 1977, and including the following subclasses of such Ford owners who actually experienced a Ford park-to-reverse incident:

> (a) all persons described in [the implied warranty incidents group] without limitation as to whether the incident resulted in property damage....

*Id.*

## I. *The Prerequisites of Rule 23(a)*

 ██ In order to bring a class action plaintiffs must satisfy the prerequisites that are set forth in part "a" of Rule 23. Failure to satisfy any of the mandatory requirements set forth in this section is fatal to class certification. *See General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982); *Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239, 246 (3d Cir.), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975). Rule 23(a) provides:

> *Prerequisites to a Class Action.* One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). The Court will address each factor to determine whether it has been satisfied.

### A. Numerosity

Under Rule 23(a)(1) the class must be so numerous that joinder would be impracticable. Here, plaintiffs have stated that "the entire class consists of owners of several million vehicles, and the number of persons having failures class claims for actual damages is at least in the thousands for each transmission type." Plaintiffs' Motion for Class Certification at 12. Because Magnu-

son-Moss requires the assemblage of at least 100-named plaintiffs, 15 U.S.C. § 2310(a)(3)(C), the numerosity requirement would be satisfied if the Court found it has jurisdiction over a class action pursuant to the terms of the Act.

 ██ Defendant argues that because the "all-owners" group is so large, the Court should not grant certification. Under Rule 23(a)(1), however, a court only looks to see if a putative class is so numerous that joinder would be inappropriate. Defendant's argument as to the extremely large size of the class should be and will be addressed in the discussion of manageability issues that are raised in (b)(3) class actions. *See* Fed.R.Civ.P. 23(b)(3)(D); *infra* at 396–398. The Court finds that plaintiffs have satisfied the numerosity requirement set forth in Rule 23(a).

### B. Common Questions of Law or Fact

Neither plaintiffs nor defendant addresses the requirements of this prerequisite to maintaining a class. But "a few courts in actions brought under subdivision (b)(3) have not drawn a distinction between [the subdivision (a)(2) requirement and that of the requirement set forth in subdivision (b)(3)]." *See* C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 1763 at 610 (1972) ("Wright & Miller"). This is so because courts either have "dealt with the common-issue question simultaneously with their inquiry into whether common questions predominate or have assumed that Rule 23(a)(2) was satisfied and thought it necessary only to rule on the question whether the suit fit within subdivision (b)(3)." *Id.* (footnote omitted).

Regardless of the parties' failure to address this issue, it is plain that common issues of law or fact are present. These common issues arise from the allegations of design defects in certain Ford transmissions which allegedly produce extremely high rates of "park-to-reverse incidents," Ford's alleged knowledge of the defects, and its alleged breach of implied warranty of merchantability. Because subdivision

(b)(3) requires that questions of law or fact common to the members of the class predominate, the Court will address again in detail the issue of commonality when it discusses subdivision (b)(3) actions under the implied warranty class.

### C. Typicality of Class Representatives' Claims and Defenses with the Entire Class—Protected Interests of the Class

In their original motion for class certification filed before this Court's decision on defendant's motion to dismiss the second amended complaint, plaintiffs listed four class representatives, each owning one of the four transmission types alleged to be defective. In the briefing which transpired subsequent to the decision on the motion to dismiss the second amended complaint, plaintiffs have not stated which class representatives they wish to have pursue this action. There are, however, at least 102 individuals who could become class representatives for the implied warranty incidents class. As the court noted in *In Re "Agent Orange" Product Liability Litigation*, 506 F.Supp. 762 (E.D.N.Y.1980), "[a]lthough the named plaintiffs for purposes of the class action are yet to be designated, the court is satisfied that out of the extremely large pool available[,] representative plaintiffs can be named who will present claims typical of those of the class." *Id.* at 787. The Court takes the same position here. Out of all the potential class members for breach of implied warranty "incidents" class, plaintiffs surely will be able to provide class representatives that either represent the whole class or any subclass that may be required in the future.

The representative plaintiffs named should be able to protect the interests of absent class members. This is so because plaintiffs plan to establish their claims through the use of class-wide proof. Plaintiffs have further proposed to name a class

representative for each type of transmission at issue. The claims of these class representatives would not be antagonistic to the claims of the entire class.

Defendant argues, however, that none of the named plaintiffs listed in the complaint can represent adequately the members of the "all-owners" implied warranty group who did not endure an alleged "park-to-reverse incident" but only come to the Court seeking relief for the "difference in value" between those transmissions that they received and those that they would have received if the transmissions had been warranted.

The Court agrees that the "incidents" implied warranty class representatives may have interests that are different from those of the nonincident "all-owners" group.[8] It also notes that plaintiffs have failed to list any nonincidents "all-owner" class representatives who just seek relief for either the "difference in value" or "recall/retrofit." Again, the Court believes that failure to provide a court with proposed class representatives will not be fatal to the certification issue. *See id.* The Court expects that plaintiffs will be able to provide to this action, representatives for the nonincident "all-owners" group. Failure to provide such representatives may require this Court to reconsider certification of that group.

Defendant also argues that the claims and defenses of any possible class representative would not be typical of the claims and defenses of any class which the Court might certify. Specifically, they argue that because there are four different kinds of transmissions at issue here and there are issues of causation, state law variations, and affirmative defenses, a court could never find that the claims of a class representative are typical to that of the entire class.

---

**8.** It is evident, however, that any proof of extraordinarily high Ford "park-to-reverse" frequencies and mechanical system defects that must be established for the "incidents" group in order to recover for property damage is the same proof that would be necessary for the "all-owners" group to recover "difference-in-value" damages.

The Court will address these issues in the (b)(3) subdivision of its class certification analysis. *See infra* at 393–403. It notes, however, that at this stage of the litigation, the Court is concerned with identifying only those issues which are common to the entire class. The individual issues are not part of the certification process. Further, the Court can establish certain subclasses to resolve any problems that might arise through alleged state law or product variations. *See* Fed.R.Civ.P. 23(c)(4)(B).

### D. Adequacy of Representation

The two criteria for determining the adequacy of representation are that plaintiffs' counsel be "qualified, experienced, and generally capable to conduct the proposed litigation and ... [that] the plaintiff must not have interests antagonistic to those of the class." *Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d at 247; *accord Lerwill v. Inflight Motion Pictures, Inc.,* 582 F.2d 507, 512 (9th Cir.1978); *National Association of Regional Medical Programs, Inc. v. Mathews,* 551 F.2d 340, 345 (D.C.Cir.1976), *cert. denied,* 431 U.S. 954, 97 S.Ct. 2674, 53 L.Ed.2d 270 (1977). In the previous section of this opinion, the Court addressed the potential for conflicting interest between class representatives and the entire class and did not find it to be so onerous as to prevent certification. It must now examine the adequacy of representation of plaintiffs' counsel and whether counsel is capable of effectively prosecuting this action.

Despite defendant's arguments and this Court's earlier misgivings, plaintiffs' counsel has, to date, effectively managed and advocated what can only be described as an extremely complex class action. Further, counsel has effectively managed the varying interests that have arisen among various putative classes in this case. Finally, plaintiffs' counsel has represented other Magnuson-Moss class actions and is reasonably familiar with the process. The Court expects that counsel for plaintiffs, as well as defendant, will continue to aid this Court

in managing this action. It further expects that counsel for the parties will work to overcome any prior difficulties that may have emerged during the preliminary stages of this action.

Upon reviewing the preliminary requirements of Rule 23(a), the Court is satisfied that the four prerequisites of numerosity, commonality, typicality, and adequacy of representation have been satisfied. The Court must note that for it to address every conceivable argument and every defense raised during this class certification process would be prohibitive. The Court has, however, examined all of these arguments and has found that plaintiffs have satisfied the necessary prerequisites of Rule 23.

### II. The Requirements of Rule 23(b)

The Court now must examine whether plaintiff can satisfy the requirements of subdivision "b." Plaintiffs seek relief for breach of implied warranty pursuant to both subdivisions (b)(2) and (b)(3) of Rule 23.

### A. Rule 23(b)(2)

Under subdivision (b)(2) of Rule 23, plaintiffs seek either recall and retrofit of the FMX, C–3, C–4, and C–6 automatic transmission or the issuance of extended written warranties covering all damage which might result from a future "park-to-reverse incident" from these transmissions.

Subpart (b)(2) provides that a class may be certified under this subdivision where "[t]he party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole...." Fed.R.Civ.P. 23(b)(2). The Advisory Committee Note states that:

> This subdivision is intended to reach situations where a party has taken action or refused to take action with respect to a class, and final relief of an injunctive nature or of a corresponding declaratory nature, settling the legality of the behav-

ior with respect to the class as a whole, is appropriate.... The subdivision does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages.

Fed.R.Civ.P. 23 Advisory Committee Note. As the court noted in *Robertson v. National Basketball Association*, 389 F.Supp. 867 (S.D.N.Y.1975), "[c]lass actions are generally not maintainable under this provision when money damages comprise a significant, if not enormous portion of the total relief requested." *Id.* at 900 (footnote omitted); *see also* Newberg, Herbert B., *Class Actions* § 1145a at 242 (1977) (under a (b)(2) action injunctive and declaratory relief must be the predominant remedy requested from the class members). When equitable relief is the fall-back position and not the principal purpose of the action, Rule 23(b)(2) is generally not available. *See Krehl v. Baskin-Robbins Ice Cream Co.*, 78 F.R.D. 108, 117 (C.D.Cal.1978).

 In reviewing plaintiffs' overall claims, it is clear that what plaintiffs principally seek here are damages for breach of implied warranty. Further, the Court notes that where damages would be an adequate form of compensation for the injury of an alleged breach of implied warranty, equitable relief, such as recall or retrofit, would not normally lie. *See Restatement 2d, Contracts 2d* § 359(1) (1981). ("Specific performance or an injunction will not be ordered if damages would be adequate to protect the expectation interest of the injured party."). Therefore, the Court will decline at this juncture to certify a class under subdivision (b)(2).

### B. Rule 23(b)(3)

Under subdivision (b)(3) plaintiffs seek damages for breach of implied warranty for individuals who owned Ford cars with FMX, C–3, C–4, or C–6 transmission, experienced a "park-to-reverse incident" with their transmission and incurred some property damage, as well as all owners who owned one of the above-described vehicles but did not necessarily experience an "incident." This group would be limited to those plaintiffs who purchased vehicles in States that do not require the presence of vertical privity to bring a claim for breach of implied warranty.[9]

In order to maintain a class action under subdivision (b)(3),

[T]he court [must find] that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3).

### 1. Predomination in General

 Before addressing both the "all-owners difference-in-value-damages" group and the "incidents" group pursuing claims for breach of implied warranty, the Court must attempt to clarify the meaning of the predomination requirement as set forth in subdivision (b)(3). Although numerous courts have· applied varying definitions to this requirement, the Court is satisfied with the standard that there must exist a "common nucleus of operative facts or

---

**9.** In its decision of March 14, 1984, the Court found that State privity requirements for claims of breach of implied warranty under the Act must be examined. *See Walsh v. Ford Motor Co.*, 588 F.Supp. at 1525–26. The Court specifically examined the privity requirements of 13 States where plaintiffs purchased their vehicles, out of a total of 38 States listed in the complaint. Of these 13 States, 11 of them require some form of vertical privity between the owner and manufacturer. The remaining 25 States listed in the complaint were not contested by Ford and, therefore, are presumed not to require vertical privity.

law." *Payton v. Abbott Labs*, 83 F.R.D. 382, 391 (D.Mass.1979), *vacated on other grounds*, 100 F.R.D. 336 (1983); *see also Esplin v. Hirschi*, 402 F.2d 94, 99 (10th Cir.1968), *cert. denied*, 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459 (1969); *Siegel v. Chicken Delight, Inc.*, 271 F.Supp. 722, 726 (N.D.Cal.1967). Although common questions of law or fact must predominate, these questions need not be dispositive of the entire case. Professors Wright and Miller state that "when common questions represent a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is a clear justification for handling the dispute on a representative rather than on an individual basis." Wright & Miller § 1778 at 53.

When examining the predominance requirement, it is important to remember that this inquiry is not meant to measure the compatability of class action procedures with substantive law, Note, *Developments in the Law—Class Actions*, 89 Harv.L.Rev. 1318, 1505 (1976), but to determine whether "economies can be achieved by means of the class-action device[,]" Fed. R.Civ.P. 23 Advisory Committee Note. Further, courts have the power and discretion to limit the class to particular issues in the case or to divide a class into various subclasses or otherwise bifurcate noncommon from common issues in the case. Fed. R.Civ.P. 23(c)(4). Finally, the Court, if necessary, may amend, alter, or vacate a certification order if it finds that the predomination requirement is no longer satisfied. Fed.R.Civ.P. 23(c)(1). What is plain here is that Rule 23 "calls upon the judges to judge—to weigh the particular circumstances of particular cases and decide concretely what will work, and how to work, in the individual situations as they appear." Frankel, Marvin E., *Some Preliminary Observations Concerning Civil Rule 23*, 43 F.R.D. 39, 40 (1968).

■ In determining whether common questions of law or fact predominate, the Court must look, *inter alia*, to questions of manageability and to individual interests or concerns of the various potential class members. Here, these questions naturally involve issues such as the availability of class-wide proof in establishing a cause of action for breach of implied warranty, establishing the level of damages, handling the process of individualized affirmative defenses, the impact of potentially varying State laws on an action for breach of implied warranty, and the problem of alleged material design differences in the four transmission types at issue. Although it would be premature to resolve all of these issues at this juncture because they neither have been briefed adequately by the parties nor are ripe for resolution, the Court demonstrates below that none of these issues necessarily prevent certification, particularly at this stage of the litigation.

## 2. "Difference-in-Value" Claims of All Owners for Breach of Implied Warranty

Plaintiffs propose a class or subclass of "all owners" of the relevant transmission types regardless of whether they endured a "park-to-reverse incident." Plaintiffs seek the difference in value between the transmissions as received and those transmissions as warranted. This class, because of statute of limitations reasons, does not include those owners who purchased their vehicles before August 21, 1977, and who did not experience a park-to-reverse transmission incident prior to November 2, 1977. The class is further limited to those individuals who purchased their cars in States which do not require the existence of vertical privity between the seller and buyer. Plaintiffs assert that the common issues which predominate over this class include: whether the subject transmissions were defective in that they were subject to an unacceptably high rate of "park-to-reverse" incidents and if these transmissions were defective, what would be the difference in value between transmissions or vehicles warranted and those which Ford sold. Defendant opposes certification of the "all-owners" class.

a. Existence of Class-wide Proof

Defendant, in challenging the certification of an "all-owners difference-in-value" class, argues that plaintiffs have failed to demonstrate that class-wide proof is available to substantiate their allegations for breach of implied warranty.

Plaintiffs state that they intend to rely on at least three forms of proof to substantiate their claims. They include: statistical analysis from the Second National Highway Traffic Safety Administration ("NHTSA") Hotline Survey to demonstrate extraordinarily high rates of "park-to-reverse" transmission incidents; statistical analysis of "park-to-reverse" complaints on vehicles produced before and after the 1980 design changes; and testimony from plaintiffs' experts explaining the common design defects in the four transmissions at issue and the reasons why the "park-to-reverse" incidents occur. Plaintiffs state that if the Court, at some date in the future, finds the Second NHTSA Hotline Survey statistically inaccurate and therefore inadmissible at trial, they are prepared to engage and retain an independent survey firm to conduct a survey which would be admissible in court.

Defendant finds fault with each form of evidence which plaintiffs plan to offer. Ford argues that the Second NHTSA Survey is statistically inaccurate and therefore inadmissible at trial; that proof of design changes are barred by Rule 407 of the *Federal Rules of Evidence;* [10] that there are significant material differences between the four transmissions at issue; and, finally, that "mere" assurances from plaintiffs that they can conduct a new survey that would be admissible in court is not enough to overcome Ford's evidentiary challenges.

[19] Although this Court is obliged to examine the modes of proof offered by plaintiffs, it is not, at this stage, required to determine whether a specific form of proof planned to be offered at trial passes evidentiary muster. To make such a determination at this stage would compel the Court to decide an issue that is neither ripe for resolution nor necessary to resolve class certification issues or move this case forward to trial. The Court has, however, closely examined defendant's challenge to plaintiffs' offered proof. For purposes of class certification, the Court concludes that plaintiffs have presented viable means of proving their claims of defect.

The only issue that concerns the Court when examining the existence of class-wide proof is whether there are material differences between the four transmissions at issue which would prevent the presentation of class-wide proof. The affidavits submitted by experts from both parties insist strenuously that there are or are not material differences between these transmissions. Further, the exhibits provided by the parties stress equally the correctness of their respective positions. Despite the immense volume of the material on this question, the Court will not determine, at this stage, whether or not these four transmissions are sufficiently and materially similar so as to permit them to be included in a single class. The Court, however, is prepared to separate each transmission type into a subclass if it concludes at a later stage that such a division is necessary. *See* Fed.R.Civ.P. 23(c)(4), (c)(1).

Ford further argues, however, that not only are there four distinct transmissions at issue in this case, but also that these transmissions are used in connection with five different column designs, three different types of linkage systems, and numerous different kinds of Ford vehicles.

**10.** Rule 407 of the *Federal Rules of Evidence* provides:

When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in con-

nection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

The Court is not convinced that these differences are material enough to prevent class-wide proof of breach of warranty. For purposes of class certification, plaintiffs have credibly alleged common defects, certainly at least as to each type of transmission at issue. As the court noted in *Shelter Realty Corp. v. Allied Maintenance Corp.*, 75 F.R.D. 34 (S.D.N.Y.1977), when it certified an antitrust case despite alleged product differences and the lack of a single conspiracy:

> [T]he courts have found it appropriate to look past surface distinctions among the products purchased by class members or the marketing mechanisms involved when allegations of anti-competitive behavior embracing all of the various products and distribution patterns have been credibly pleaded.... Identical products, uniform prices, and unitary distribution patterns are not indispensible for class certification in this context.

*Id.* at 37. *See also Landesman v. General Motors Corp.*, 42 Ill.App.3d 363, 1 Ill.Dec. 105, 107, 356 N.E.2d 105, 107 (1976), *vacated on other grounds*, 72 Ill.2d 44, 18 Ill. Dec. 328, 377 N.E.2d 813 (1978); *Anthony v. General Motors Corp.*, 33 Cal.App.3d 699, 109 Cal.Rptr. 254, 257 (1973). This Court must also look beyond the surface distinctions and examine only those *material* differences that may potentially prevent a finding of predominance of common questions of law or fact. Whatever differences exist, the Court is convinced, at this stage, that these differences are either not material or can easily be subdivided into various subclasses pursuant to Rule 23(c)(4). Alleged product variations do not prevent this Court from finding "predominance."

### b. State Law Variations

In opposing class certification for breach of implied warranty, defendant argues that the variations in State law prohibit a finding of predomination for common questions of law. The Court disagrees.

Pursuant to the terms of the Act, courts are required to look to State law for the meaning and creation of implied warranty. *See* 15 U.S.C. § 2301(7). ("The term 'implied warranty' means an implied warranty arising under State law....") As this Court has ruled in the past, when determining whether an individual plaintiff may bring a cause of action under the Act for breach of implied warranty, that plaintiff first must look to the law of the State where he purchased his consumer product to see if that State requires the presence of vertical privity between himself and the manufacturer. *See Walsh v. Ford Motor Co.*, 588 F.Supp. at 1526. If the presence of vertical privity is necessary to create the existence of an implied warranty, plaintiffs from those States have no claim for an alleged breach of said warranty. *Id.* at 1525–26.

This examination of the varying State laws relating to the question of vertical privity does not serve as a barrier to class certification. In its opinion of March 14, 1984, the Court addressed the question of vertical privity in 13 contested States out of a total of 38 States listed in the second amended complaint where named plaintiffs purchased their vehicles. The Court is prepared, upon proper motion, to address the remaining jurisdictions not listed in the amended complaint on the issue of vertical privity.[11]

Ford also argues that there are numerous other State law variations which must be addressed in a class-wide claim for breach of implied warranty and that these variations prevent this Court from making a finding of predomination of common questions of law.

If the Court were to accept defendant's argument, no multi-State class action for breach of implied warranty under the Act could ever be possible. The denial of class certification because of potential State law variations would, in effect, repeal a congressionally-mandated Federal cause of action. Whatever State law variations may

---

**11.** These States include Arkansas, Alaska, Hawaii, Kentucky, Louisiana, Montana, New Mexico, North Dakota, South Dakota, Rhode Island, Utah, and Wyoming.

be present here, that alone cannot deny certification.

The Court notes that although State law may create and define the existence of an implied warranty, the cause of action for the breach of said warranty is a *Federal* cause of action. *Compare* 15 U.S.C. § 2301(7) ("The term 'implied warranty' means an implied warranty arising under State law. . . .") *with* 15 U.S.C. § 2310(d)(1) ("a consumer who is damaged by the failure of a . . . warrantor . . . to comply with any obligation under this chapter, or under a written warranty [or] implied warranty . . . may bring suit for damages and other legal and equitable relief [in both State or Federal court]"). To conclude that a court must look to the many States, with their varying judicial interpretations of what constitutes breach of implied warranty, would make it virtually impossible to apply the Act in multi-State class actions for Magnuson-Moss breach of implied warranty claims. Surely, Congress could not have had intended such an unworkable result in a class action context.[12] Accordingly, the issue of varying State laws for breach of implied warranty for all owners as well as those in the "incidents" group cannot prevent the Court, at this time, from making a finding of predomination.

c. Damages for All-Owners Class

Defendant also argues that the question of individual damages cannot be resolved without individualized determinations as to each class.

Despite defendant's arguments, the issue of class-wide damages for the "all-owners" group can be easily resolved. Plaintiffs, for example, suggest that one method for determining damages of the proposed "all-owners difference-in-value" group is to examine the cost of a retrofit device which would eliminate the allegedly excessive "park-to-reverse incidents" risk and award that amount. Plaintiffs argue that this would eliminate any "difference in value"

between the transmissions that they received and those that would be warrantable. Moreover, because the issue of property damage is not present in this group, the question of determining class-wide relief can be easily resolved. Accordingly, the issue of damages for the "all-owners" class will not bar a finding of predomination.

d. Viability of Asserting an All-Owners Difference-in-Value Group

Defendant's principal argument against the certification of an "all-owners" group is that the transmissions that have not had an alleged "park-to-reverse incident" have performed as warranted and therefore are merchantable. Ford argues that the reasoning set forth in *Feinstein v. Firestone Tire & Rubber Co.*, 535 F.Supp. 595 (S.D. N.Y.1982), compels this Court not to certify an all-owners class. The court in *Feinstein*, in refusing to certify a class of all owners of Firestone 500 steel-belted radial tires stated that:

The case at bar does not turn on the adequacy of plaintiffs' pleadings, but rather upon actual performance of Firestone's tires, as revealed by the record developed between filing the complaint and moving for certification. The majority of the tires sold to putative class members, by doing what they were supposed to do for as long as they were supposed to do it, clearly lived up to that "minimum level of quality" which is all U.C.C. § 2–314(2)(c) requires. Thus no claim for breach of implied warranty is maintainable in respect of such tires. Plaintiff's bald assertion that a "common" defect *which never manifests itself ipso facto* caused economic loss" and breach of implied warranty is simply not the law.

*Id.* at 603 (emphasis in original).

Whatever the *Feinstein* court's reasons for making a strictly merits decision at the class certification stage of the litigation,

---

**12.** The Court, however, is not prepared at this juncture to address the question of which law shall apply. At the appropriate time in this action this issue shall be addressed once the Court has had the benefit of the parties' briefing on this issue.

this Court does not feel bound, at this juncture, to make such a merits determination. As the Supreme Court in *Eisen* adopted: "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin*, 417 U.S. at 178, 94 S.Ct. at 2153 (quoting *Miller v. Mackey International, Inc.*, 452 F.2d 424, 427 (5th Cir.1971); *see also Blackie v. Barrack*, 524 F.2d at 901. Therefore, regardless of whether plaintiffs may be able to prevail on their claim of breach of implied warranty for all owners of vehicles with the relevant transmission is not for this Court to determine at this stage of the litigation. Therefore, defendant's arguments are not controlling.

e. Individual Interests, Manageability, and Superiority Concerns

A vast majority of the "all-owners" plaintiffs seek relief only for "difference in value" or costs which would be associated with retrofiting the subject transmissions. These claims, it is undisputed, are relatively small and may amount to a total of under $50.00 for each Ford owner.

A class action for this group is, in effect, the only tangible way these plaintiffs could ever get relief for the claims they assert. Without the use of a class action, these plaintiffs would be without a remedy. A class action for relief is superior to receiving no relief at all.

As far as the manageability issues are concerned, both plaintiffs and defendant agree that a class of all owners for breach of warranty would be extremely large. Defendant argues that the size of this group would make management of the class action completely intractable.

The Court disagrees. Although this class will present its own group of difficult problems, the Court is of the belief that these difficulties can be managed effective-

ly and efficiently with the aid of counsel. The question of individual issues does not cause difficulty here. Plaintiffs plan to present class-wide proof on the issue of merchantability. Defendant, in turn, will present its own class-wide evidence refuting plaintiffs' claims. The jury, it is presumed, will make a determination as to the merits of plaintiffs' claims. If they find that plaintiffs have prevailed, they will formulate a class-wide damage amount which each plaintiff, upon proper documentation, may claim.[13]

Finally, the issue of individual interests must be addressed. Ford argues that by proceeding as a class, some individual plaintiffs may potentially forego rights that they might otherwise receive if they had proceeded under their own State law remedies.

The Court notes that for a large majority of the potential plaintiffs a class action procedure would be the only possible way they might be able to attain relief. As Professors Wright and Miller note:

> [T]he court must weigh the advantages of determining the common issues by means of a class action against the individual members' interest in separate adjudications of their rights. If the court determines that the former outweighs the latter, a class action under Rule 23(b)(3) should be proper.
>
> \* \* \* \* \* \*
>
> [T]he interest the individual members might have in controlling the defense or prosecution of separate suits [may not be] important, if as a practical matter multiple actions would not be feasible because of the small amounts involved.

Wright & Miller § 1780 at 66 (footnotes omitted).

Whatever individual interests might exist for the "all-owners" plaintiffs, the reality that the class action procedure is the only viable means of pursuing these claims, certainly overrides these hypothetical individu-

---

**13.** The issue of notice which could raise some manageability concerns is addressed *infra* at 409–412.

al concerns. As the court in *Veron J. Rockler & Co. v. Graphic Enterprises, Inc.*, 52 F.R.D. 335 (D.Minn.1971) stated so aptly:

> Defendants' attack upon the superiority of a class action would appear to rest upon the truism that the interests of individual plaintiffs are best protected through vigorous and capable prosecution of separate trials. If such were a proper basis for the determination of superiority, there would never be a class action.... [M]any of the claims of individual class members may be too small to justify on an individual basis, the investigative and litigation expense involved in prosecuting the suit.... Thus, absent active solicitation of claimants, with, perhaps, a promise to bear the cost of litigation, it is unlikely that all or most of those class members having small claims will ever come into court, regardless of the merits of their claims.

*Id.* at 346–47 (footnotes and citations omitted).

After examining all the arguments of the parties, the Court perceives no major impediment to conditionally certifying a group of "all-owners-difference-in-value" plaintiffs who assert claims for breach of implied warranty under the Act.

### 3. Incidents Group for Claims of Breach of Implied Warranty

Plaintiffs in the implied warranty class also propose a group of plaintiffs who sustained property damage due to an alleged "park-to-reverse incident." This group, like the "all-owners" group, pursue claims for breach of implied warranty under the provisions of the Act.

Defendant opposes certification of such a class because of the numerous individual issues involved in such a claim which cannot be resolved on a class-wide basis. As defendant notes, this group seeks recovery, not on the basis of a single auto accident or event, but rather on the basis of potentially tens of thousands of distinct automobile accidents.

Defendant argues that the Advisory Committee Note on Rule 23 states unequivocally that:

> A "mass accident" resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses of liability, would be present, affecting the individuals in different ways. In these circumstances an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried.

Fed.R.Civ.P. 23 Advisory Committee Note. Ford notes that courts have been reluctant to certify class actions involving claims on the basis of individualized experience with a mass-produced product. *See In re Northern District of California, Dalkon Shield IUD Products Liability Litigation*, 693 F.2d 847, 853 (9th Cir.1982), *cert. denied*, 459 U.S. 1171, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983); *McElhaney v. Eli Lilly & Co.*, 93 F.R.D. 875, 880 (D.S.D.1982); *Rosenfeld v. A.H. Robins Co.*, 63 A.D.2d 11, 407 N.Y.S.2d 196, 198–201, *appeal dismissed*, 46 N.Y.2d 731, 413 N.Y.S.2d 374, 385 N.E.2d 1301 (1978).

#### a. Satisfying the Predomination Requirement

Although the Court is aware of the management difficulties that may occur from certifying this group, and also is aware that there is a potential for the presence of numerous individual issues, the economies realized in addressing the common class-wide issues of this case compel this Court to grant certification. *See* Note, *Developments in the Law—Class Actions*, 89 Harv.L.Rev. at 1505 ("the chief purpose of the predomination inquiry is ... to determine whether a class action will in fact realize any litigation economies").

It must be noted that despite the Advisory Committee Note on Rule 23(b)(3), subdivision (b)(3)

> seems particularly appropriate for some tort cases of this type. The central issue of liability, for example, may be a difficult one that occasionally will require

expert testimony, perhaps concerning the physical condition of a vehicle or the state of a technological art in a particular field of transportation or manufacturing. If the various tort claims were tried individually, the evidence would have to be repeated time and time again.

Wright & Miller § 1783 at 116–117.[14] Moreover, courts aware of the Advisory Committee admonition have still certified class actions in products liability actions. *See, e.g., In re "Agent Orange" Product Liability Litigation,* 100 F.R.D. 718, 723 (E.D.N.Y.1983), *petition for writ of mandamus denied,* 725 F.2d 858 (2d Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 1417, 79 L.Ed.2d 743 (1984); *Payton v. Abbott Labs,* 83 F.R.D. at 391.

In approaching the issue of certification for the incidents group, the Court must also be mindful that although there is the formidable presence of potentially individual issues such as causation, affirmative defenses, and damages, the existence of these issues is not necessarily dispositive. The Court has the tools available either to certify a strictly limited group of issues, establish various subclasses, or address the common issues on a class-wide basis and manage the individual issues such as damages and individual affirmative defenses at the conclusion of the class-wide trial.

Judge Weinstein in *In Re "Agent Orange" Product Liability Litigation,* 100 F.R.D. 718, was faced with the identical argument that defendant asserts here. He noted that:

> [d]efendants strongly contend ... that the heart of any product liability claim, causation, can never be common to the class since each veteran, spouse and offspring who has instituted a lawsuit claiming direct or derivative injuries from the veteran's exposure to Agent

Orange brings to this case a unique history upon which his or her claim for damages is predicated. Each veteran was exposed, if at all, at different times, at different places and under different circumstances. Therefore, the argument continues, a determination on the issue of causation, whether made as a finding of general causation or as a result of a finding in "test" cases, can never be dispositive of the claims of the other class members and as a result common questions do not "predominate."

*Id.* at 721. Despite such formidable arguments the court in *"Agent Orange"* did certify a class of all persons who were harmed by exposure to the carcinogen, including spouses and family members who were directly or derivatively injured as a result of the exposure. *Id.* at 729. This Court, despite the presence of what appears to be formidable, but nevertheless arguable "individual" issues, also will certify an "incidents" class for breach of implied warranty. Although the Court is not prepared to decide, at this stage, exactly how it will resolve some of the noncommon issues in this case, such as causation and affirmative defenses, it notes that plaintiffs' "presumption" argument may provide a means for resolving these issues.

b. Plaintiffs' Suggested Presumption Argument

Plaintiffs intend to rely on class-wide technical and statistical proof which would demonstrate the "extremely high" rate of Ford "park-to-reverse incidents," specific common defects in the transmissions, and direct proof of the unlikelihood of intervening causes to establish a *prima facie* presumption that each incident was due to design and manufacturing error and not a hypothetical intervening cause. Thus, plaintiffs propose to utilize class-wide proof

---

**14.** The court in *In re Gabel,* 350 F.Supp. 624 (C.D.Cal.1972), noted that:

notwithstanding some cases to the contrary and notwithstanding the suggestion in the notes of the advisory committee that class actions should not be used in Tort cases, the plain language of F.R.Civ.P. 23 was devised for just such a situation.... If that rule was

not intended to cover Tort actions or death actions in crash cases, or *any kind of a Mass Tort,* it would have been simple enough to have said so in the text of the rule. But the rule is very broad in its language so as to permit the courts to eliminate repetitive and burdensome litigation....

*Id.* at 627 (emphasis added).

on the issue of merchantability in order to prove their claim of breach of implied warranty for owners who endured "park-to-reverse incidents."

Plaintiffs propose that upon presentation of class-wide proof, defendant will have the opportunity to counter with its own class-wide evidence. Ford could present its own expert testimony designed to demonstrate how intervening causes might have been responsible for "park-to-reverse incidents." At this stage, no individual issues would be examined. If plaintiffs do not prevail in establishing a presumption as to liability for breach of warranty, the case would be dismissed and there would be no need to delve into individual issues.

Plaintiffs further state that if they prevail on the class-wide issues and establish a *prima facie* "presumption" for breach of implied warranty, defendant would have the opportunity to challenge any individual class member on the ground that some intervening cause was responsible for the product failure. At this stage, individual issues of damages would be addressed as well.

Plaintiffs note that, when class-wide proof is offered to demonstrate that the subject transmissions suffered from a higher failure rate as compared to other types of transmissions, the number of "park-to-reverse incidents" that were the result of intervening causes should be no higher than the number of incidents for owners of other manufacturers' vehicles. Plaintiffs state that this is true unless Ford can demonstrate that its vehicles were sold not to ordinary motorists, but to a special group of motorists who, for example, drove their vehicles in some unusual manner which caused these transmissions to fail. They further state that the percentage of incidents involving intervening causes should be no higher than any other type or brand of transmission if there were no defect in the subject transmission.

One of defendant's principal claims of individual intervening causes is that of driver error. It argues that by failing to place the control lever properly in the park position, the individual driver causes the transmission lever to slip into the reverse position. Ford contends that examination of individual circumstances to determine if driver error was responsible for a "park-to-reverse" incident must take place for each plaintiff. Plaintiffs note, however, that claims of driver error cannot be considered an intervening cause. They assert that whether the alleged transmission design defect is such that a driver, conforming to ordinary standards of care, would at times likely fail to engage the car in the "true" park position is a central merits issue that must be decided at the class-wide stage of this litigation.

Plaintiffs also state that if they prevail on the class-wide *prima facie* presumption, any alleged intervening causes as asserted by Ford would be *de minimus* in number. They rely on the experiences of the named plaintiffs set forth in the detailed examination and analysis of the 163 vehicles listed in the second amended complaint. *See* Plaintiffs' Reply to Defendant's Opposition to Class Certification of the Count I Implied Warranty Claims, Exhibit A. This detailed analysis of the 163 vehicles demonstrates that the total number of prior accidents, prior transmission repairs, mechanical discrepancies, and other "intervening causes" were not significant. Although defendant disputes some of the conclusions of this examination, plaintiffs' point is well made. This analysis indicates that for a large majority of alleged "park-to-reverse incidents" an "intervening cause" may not be responsible. If plaintiffs are successful in establishing their presumption, the fact that a defendant may be able to defeat a showing of causation as to a few specific plaintiff class members will not transform the common issues into a multitude of individual questions. *See Blackie v. Barrack*, 524 F.2d at 907 n. 22.

Ford argues that if the Court finds plaintiffs' "presumption" argument compelling, defendant will be entitled to have extensive discovery on each individual plaintiff who asserts claims for breach of implied warranty. Although a defendant has a right

to disprove causation as to an individual plaintiff, that defendant

> does not have unlimited rights to discovery against unnamed class members; the suit remains a representative one. *See Clark v. Universal Builders, Inc.*, 501 F.2d 324 (7th Cir.1974); *Gardner v. Awards Marketing Corporation* 55 F.R.D. 460 (D.Utah 1972); *Fischer v. Wolfinbarger*, 55 F.R.D. 129 (W.D.Ky. 1971). The district judge may reasonably control discovery to keep the suit within manageable bounds, and to prevent fruitless fishing expeditions with little promise of success. He may also exercise discretion in the conduct of the trial, to prevent a time-consuming series of mini-trials on causation, by limiting introduction of repetitive evidence or by limiting evidence to instances where causation is in doubt; he may also postpone trial of the rebuttal of individual causation until the damage stage of the trial; indeed, he has extensive powers to expedite the suit with procedural innovations. *See* Rule 23(d).

*Blackie v. Barrack*, 524 F.2d at 907 n. 22. For the reasons stated in *Blackie*, the Court does not find that defendant would necessarily be entitled to unlimited discovery. Plaintiffs propose that when an individual plaintiff submits a notice of claim, that plaintiff could be required by Ford to answer questions such as the circumstances of the "incident" and the repair history of his vehicle. When these responses give Ford good cause, it could challenge any specific claim and take the necessary discovery to defend the individual claim. Discovery of any individual plaintiff could be limited to only when Ford has reason to believe that the claimed incident was caused by events other than transmission failure due to a design defect.

Plaintiffs cite as a proposition for this *prima facie* "presumption" method of proof, Title VII and securities fraud cases. *See, e.g., id.; Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Ford argues that plaintiffs' *prima facie* presumption theory is limited to Title VII or federal securities cases. It avers

that this is true because either the express language and legislative history of the relevant statute, or certain "substantive principles" of the statute, permits courts to apply this presumption in these narrow circumstances.

The Court notes, however, that the use of a presumption also has been applied in fraud actions where individual proof of reliance was found to be unnecessary if it could be shown that the misrepresentation was material, *see Collins v. Rocha*, 7 Cal.3d 232, 237, 102 Cal.Rptr. 1, 3, 497 P.2d 225 (1972); *Vasquez v. Superior Court*, 4 Cal.3d 800, 815, 94 Cal.Rptr. 796, 804–05, 484 P.2d 964, 972–73 (1971); *Metowski v. Traid Corporation*, 28 Cal.App.3d 332, 338, 104 Cal.Rptr. 599, 601 (1972). Moreover, on appeal from a products liability action against a drug manufacturer, the United States Court of Appeals for the Fifth Circuit did not require proof of proximate cause but instead permitted the use of a rebuttable presumption to establish liability. That court noted:

> Where a consumer, whose injury the manufacturer should have reasonably foreseen, is injured by a product sold without a required warning, a rebuttable presumption will arise that the consumer would have read any warning provided by the manufacturer, and acted so as to minimize the risks. In the absence of evidence rebutting the presumption, a jury finding that the defendant's product was the producing cause of the plaintiff's injury would be sufficient to hold him liable.

*Reyes v. Wyeth Laboratories*, 498 F.2d 1264, 1281 (5th Cir.), *cert. denied*, 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974); *Cunningham v. Charles Pfizer & Co.*, 532 P.2d 1377, 1382 (Okla.1974). *See also Allen v. United States*, 588 F.Supp. 247, 415 (D.Utah 1984). Commentators have embraced the use of general modes of proof to help forward the use of class actions and resolve common claims and injuries. *See, e.g.*, Note, *Class Action in A Product Liability Context: The Predomination Re-*

*quirement and Cause-In-Fact,* Hofstra L.Rev. 859 (1978). Despite defendant's argument, the Court finds that the use of general modes of proof and the establishment of the rebuttable presumption can be applied in cases that reach beyond Title VII or federal securities regulation cases.

The use of a rebuttable presumption would be consistent with the remedial purposes of the Act. The Act is designed in part to ensure that consumers, who have been injured by a breach of warranty, have a means by which they can attain relief. In the House Report accompanying the warranty bill, the Committee on Interstate and Foreign Commerce explains:

> [I]f the [jurisdictional] conditions ... are met by a class of consumers damaged by a failure to comply with a warranty ... or a violation of [the Act], section 110(d) [15 U.S.C. § 2310(d)] should be construed reasonably to authorize the maintenance of a class action. In this context, your Committee would emphasize that this section is remedial in nature and is designed to facilitate relief which would otherwise not be available as a practical matter for individual consumers.

House Committee Report, *reprinted in* 1974 U.S.Code Cong. & Ad.News at 7724. Having to prove individually that the design defect was the cause in fact of a "park-to-reverse incident" would surely preclude the use of class action procedures for breach of implied warranty under the Magnuson-Moss Act.

It must be stressed again that the use of a class-wide *prima facie* presumption to establish breach of warranty will not prevent defendant from challenging any claim on the grounds of some intervening cause. In the damages portion of the case, Ford

will have the opportunity to make such challenges.[15]

Accordingly, the Court finds that the use of plaintiffs' "presumption" theory may provide a reasonable means by which plaintiffs may prosecute their claims. It must be noted that each plaintiff is only asking that his transmission be judged for what it is, a mass-produced unit, which if compared to similar products, allegedly has a significantly higher failure rate. As the Court approaches the trial in this case, it shall, upon adequate briefing from the parties, address these issues more completely.

### c. Questions of Manageability

As with any large class action that requires an examination of individual damages, the manageability problems are immense. Merely the presence of individual damages issues, however, cannot bar certification. As the court stated in *Samuel v. University of Pittsburgh,* 538 F.2d 991 (3d Cir.1976):

> In almost every class action, factual determinations [of damages] ... to individual class members must be made.... Still we know of no case where this has prevented a court from aiding the class to obtain its just restitution. Indeed, to decertify a class on the issue of damages or restitution may well be effectively to sound the death-knell of the class action device.

*Id.* at 995 (citations and footnote omitted). *See also McCarthy v. Kleindienst,* 741 F.2d at 1415.

Although the Court is aware of the substantial difficulties involved in managing individual damage issues in a bifurcated trial, these difficulties can be overcome. One author has reviewed numerous potential alternatives available to the Court:

---

**15.** In his concurrence in part and dissent in part in *McCarthy v. Kleindienst,* 741 F.2d 1406, 1420 (D.C.Cir.1984), Judge Mikva notes of the "emptiness of th[e] distinction" between liability and damage phases of bifurcated trials. Recognizing that the noncommon damage issues may be addressed after the common issues have been dealt with on a class-wide basis, the Judge states that "I view the purported distinction [between

liability and damages] as highly formalistic, for it makes the viability of a class depend on whether the very same issue is treated as a defense to the action or as a damage mitigation measure." *Id.* This Court views the individual defenses that may be asserted by Ford to be damage mitigation and therefore should be in the individual damages issue portion of the case, not the class-wide liability portion.

As a result of the remedial problems inherent in (b)(3) class damage actions, commentators have proposed numerous alternatives to provide relief in the event that the plaintiff class prevails on the liability issue. The courts may employ a broad range of available techniques, including summary judgment procedures, damage calculations on a class-wide basis, masters' determinations, and other administrative claims processing. Courts have frequently employed a proof of claim procedure to ease the damage proof problem. In this procedure each member of the class is instructed to complete within a specified time period a standardized questionnaire describing his injury. A number of courts have proposed to employ the concept of a fluid class recovery, whereby aggregate damages are calculated and distribution is achieved through a proof-of-claim procedure. One commenator suggests trying the damage issue only once, with a single award to the class, followed by an administrative mechanism to divide the lump sum recovery among the individual members.

Comment, *Bifurcation of Liability and Damages in Rule 23(b)(3) Class Actions: History, Policy, Problems, and a Solution*, 36 Sw.L.J. 743, 756–57 (1982) (footnotes omitted); *see also, e.g.*, Williams, Spencer, *Mass Tort Class Actions: Going, Going, Gone?*, 98 F.R.D. 323 (1983). The Court at this stage is not prepared to state which method would be appropriate to resolve the individual issues presented in this case. It need not resolve this question until the class-wide issues have been tried. As the court explained in *Rosack v. Volvo of America Corp.*, 131 Cal.App.3d 741, 182 Cal.Rptr. 800 (1982), *cert. denied*, 460 U.S. 1012, 103 S.Ct. 1253, 75 L.Ed.2d 482 (1983):

speculative problems with regard to computation of damages should not ... [be] fatal to class certification.... Any one of a number of procedures [are] available which would ... allow[ ] this action to proceed and which would have postponed a specific determination at this early stage[,] of the precise formula for calculating individual damages.

*Id.* 182 Cal.Rptr. at 813.

Accordingly, for the reasons stated above, the Court can see no impediment to conditionally certifying a class for claim of breach of implied warranty arising under the Act.

### PLAINTIFFS' WRITTEN WARRANTY CLASS

Plaintiffs seek to certify the following class for breach of written warranty under Magnuson-Moss..

*Written Warranty Incidents*, pursuant to Rule 23(b)(3):

All purchasers or owners (other than for purposes of resale) of 1976–1979 and 1980 pre-design change model year Ford vehicles equipped with an FMX, C–3, C–4 or C–6 automatic transmission seeking recovery of property damages incurred as a result of a Ford park-to-reverse incident occurring within the 12,000 mile/12 month written warranty period about which they complained to Ford or a Ford dealer within a reasonable time thereafter, but excluding such persons who purchased such Ford vehicles prior to August 21, 1977 and did not experience a park-to-reverse incident prior to November 2, 1977.

Plaintiffs' Proposed Class Certification Order, June 13, 1984. Within this implied warranty group plaintiffs also seek to certify a "difference-in-value" damages class under Rule 23(b)(3) or an equitable relief "recall/retrofit" class. *See id.*

Many issues that confront the written warranty class were addressed in the Court's analysis of plaintiffs' implied warranty class. For that reason, the Court shall address briefly only those issues which are unique to the written warranty claims. For the reasons stated above, *see supra* at 391–392, the Court will decline to certify the proposed (b)(2) group of All Owners Seeking Recall/Retrofit Equitable Relief. Plaintiffs' request for monetary relief under Rule 23(b)(3) would fully com-

pensate them for their claims of breach of written warranty.

■■ With regard to plaintiffs' Rule 23(b)(3) "all-owners" and "incidents" breach of written warranty claims, defendant asserts largely the same arguments against certification. Defendant argues that issues, such as presentment, refusal of service, notice, and damages, must be considered on an individual basis before any plaintiff may prevail in a class for breach of implied warranty. As noted *supra*, the Court is prepared to address the common issues during the class-wide phase of the trial. The individual issues, if they prove to be truly in contention, shall be addressed at the individual or damages phase of the trial. Plaintiffs suggest that for a large number of plaintiffs, all that would be required at this phase would be evidence of property damages, that the incident occurred within the warranty period, and that within a reasonable time thereafter the claimant either complained to Ford or presented his vehicle to Ford or one of its dealers. Although the Court will not adopt plaintiffs' theory at this stage of the litigation, it notes that plaintiffs have, for class certification purposes, established a credible theory for proceeding on a class-wide basis for claims of breach of written warranty arising under Magnuson-Moss.

Additionally, any State law variations this Court may eventually be asked to address in the implied warranty claims arising under the Act do not present themselves in claims for breach of written warranty. The Act explicitly defines written warranty and establishes a cause of action for breach of said warranty. *See* 15 U.S.C. §§ 2301(6), 2302, 2303, 2304, 2310(d)(1). Although there are undeniably individual issues involved in the written warranty claims, particularly as to the question of damages and any mitigating factors as to the level of damages, the class-wide issues predominate over this class. Much economy will be enjoyed if plaintiffs are permitted at one judicial proceeding to try all of the written warranty issues. Accordingly, the Court will certify this class.

## PLAINTIFFS' PERSONAL INJURY CLASS

Plaintiffs seek certification of the following class:

CLASS V—*Personal Injury Incidents— Declaratory Judgment on Common Liability Issues*, pursuant to Rule 23(b)(3):

All purchasers or owners (other than for purposes of resale) of 1976–1979 and 1980 pre-design change model year Ford vehicles equipped with an FMX, C–3, C–4, or C–6 automatic transmission, including family or household members entitled to enforce Ford's written or implied warranties pursuant to UCC § 2–318, who were seriously injured in person (i.e., who claim personal injury, property, and/or punitive damages exceeding $10,-000) as a result of such Ford vehicle's park-to-reverse incident, certification of this class to be limited to the common liability issues to be litigated with respect to [the implied and written warranty classes], and including the following subclasses of such persons:

(a) all persons described in [written warranty class] without limitation as to whether the incident resulted in property damage, the date of the vehicle's purchase, or the date of the incident,

(b) all persons described in [implied warranty class] without limitation as to whether the incident resulted in property damage, the date of the vehicle's purchase, or the date of the incident, but including such Ford vehicles purchased in Connecticut, Ohio, Indiana, or Washington, and

(c) all persons injured by such incidents in the states of Alabama, Arizona, Illinois, New Jersey, New York, or Wisconsin, which persons assert strict product liability claims.

Plaintiffs' Proposed Class Certification Order, June 13, 1984.

In approaching the issue of certification for all those claiming personal injuries, the Court must be mindful of what it has al-

ready conditionally certified. Both the implied and written warranty class claims with their various potential subclasses, which arise by virtue of the Federal Magnuson-Moss Act, provide this Court and the parties with a formidable challenge. Although this Court assumes that most of the difficulty associated with proceeding with these classes can be overcome, it will not be without significant effort. The Court believes that it must undertake this effort, particularly because of the expressed intent by Congress to afford consumers effective methods to pursue their claims for breach of warranty through the class-action vehicle. Plaintiffs' personal injury claims arise, however, not under the Federal Magnuson-Moss Warranty Act, but under diversity of citizenship. The Act specifically excludes from its coverage claims for personal injuries. *See* 15 U.S.C. § 2311(b)(2).[16] The Court is, therefore, required to look to State law to determine the substance of plaintiffs' personal injury claims.

Plaintiffs assert that this class should be certified because the common issues involved in a putative personal injury class are virtually identical to those of the property damage claims arising under the "incidents" breach of implied warranty class. Plaintiffs state that whether the consequences of an alleged "park-to-reverse incident" happen to be property damage or personal injury is strictly a matter of fortuity. They argue that there is no justification for treating two types of claims differently.

Although the Court finds plaintiffs' argument persuasive, it must conclude that certification of a class for those alleging personal injury claims cannot be certified without the Court facing intractable management problems. Unlike the Magnuson-Moss warranty claims, plaintiffs' claims for personal injuries arise under State law *exclusively*. Certifying a class of this type would compel the Court to examine "56" potential State law variations. Further, as even plaintiffs note, no single theory of recovery could encompass every plaintiff. Claims for personal injury arise under at least four separate theories, including breach of express warranty, breach of implied warranty, strict liability, and negligence. Although plaintiffs state that they will be able to meet each theory of recovery when establishing their personal injury claims, the Court is concerned about the number of potential variables that could face a jury in what plaintiffs describe as the common-issue, class-wide portion of the trial. The potential for confusion by the jury would be significant.

In addition, the management difficulties in coordinating these subclasses and processing the individual issues and damage claims would be immense. Unlike the property damage claims for breach of warranty arising under the Act, extensive discovery will be required as to each individual's claims concerning, for example, the extent of injuries incurred. No court-supervised claims process could possibly handle the multitude of individual issues that would arise from a personal injury class.

The Court is also concerned about the individual interests that are ·at stake in a personal injury class claim. Plaintiffs with personal injury claims, arising from a "park-to-reverse incident," may have significantly higher monetary claims and, therefore, would have a correspondingly greater interest in individually controlling the course of their litigation. As one commentator has observed, "Whenever individual class members claim high value, their interests in controlling the prosecution of those claims is increased and the propriety of a class action decreased." Note, *Mass Accident Class Actions*, 60 Calif.L.Rev. 1615, 1634 (1972). The presence of potentially significant individual interests cuts against a grant of certification of this class.

Because of what the Court perceives to be intractable management problems, as

---

**16.** Section 2311(b)(2) of Title 15, United States Code provides in pertinent part: "Nothing in this chapter … shall … affect the liability of, or impose liability on, any person for personal injury…."

well as the compelling interests of individuals who claim personal injuries, the Court, in its discretion, denies certification of the personal injury class.[17] It denies certification of this class in light of the classes that it has already certified and given the complexities and difficulties yet to be dealt with as to those certified classes.[18]

## PLAINTIFFS' PUNITIVE DAMAGES CLASS

Finally, plaintiffs seek to certify the following class. claim for punitive damages:

*Punitive Damages Incidents:*

All members of [the implied and written warranty classes and the personal injury class] including the following subclasses of such persons:

(a) pursuant to Rule 23(b)(3), all such persons claiming punitive damages directly under the Magnuson-Moss Act, and

(b) pursuant to Rule 23(b)(1)(B), all such persons, except those whose injuries occurred or whose Ford vehicles were purchased in Washington, Louisiana, Massachusetts, Connecticut, and Michigan, claiming punitive damages under state law, with further subclasses defined as necessary according to

(i) whether the person asserts a warranty, strict products liability, or negligence claim, and

(ii) whether the applicable state standard for an award of punitive damages

is gross negligence or willful misconduct.

Plaintiffs' Proposed Certification Order, June 13, 1983.[19]

Because the Court has declined to certify the personal injury incidents putative class, punitive damages claims must arise solely from the implied and written warranty claims under the Magnuson-Moss Act.

In reviewing the text of the Act and its legislative history, the Court observes that no mention of punitive damages is made by Congress. In an act which specifically discusses attorney's fees and the kinds of claims permitted and prohibited, this absence of language could lead a court to conclude that Congress did not intend to have punitive damages lie in Magnuson-Moss causes of action. The Act does, however, provide that "a consumer who is damaged by the failure of a ... warrantor ... to comply with any obligation ... under a written warranty [or] implied warranty ... may bring suit for damages *and other legal and equitable relief....*" 15 U.S.C. § 2310(d)(1) (emphasis added). Magnuson-Moss also provides that "[n]othing in [the Act] shall invalidate or restrict any right or remedy of any consumer under State law...." 15 U.S.C. § 2311(b)(1).

Plaintiffs argue that uniform Federal law governs the award of punitive damages under the Act. This uniform Federal law would be derived from a majority of all the States, as surveyed by the Court. Plaintiffs cite *Smith v. Wade,* 461 U.S. 30, 103

---

**17.** The Court observes in passing that this denial of certification does not necessarily foreclose for this putative class the opportunity to benefit from a favorable determination as to the other claims certified in this case. The "personal injury" group may possibly enjoy the offensive use of collateral estoppel through the potential *res judicata* effect of successful litigation on the implied and written warranty class claims. *See Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979).

**18.** Ford argues that the 28 named plaintiffs listed in the second amended complaint who are pursuing personal injury claims should be transferred, pursuant to 28 U.S.C. § 1404, to the jurisdiction where the accident occurred or where these plaintiffs reside. Plaintiffs oppose

such a transfer. The Court, at this time, will withhold judgment on this issue until it has been fully addressed by the parties.

**19.** Plaintiffs exclude in their (b)(1)(B) subclass all persons who purchased their vehicles in the States of Washington, Louisiana, Massachusetts, Connecticut, and Michigan. They reason that "a few states—Washington, Massachusetts or Louisiana—do not permit punitive damage recoveries for common law torts and that Connecticut and Michigan permit only 'exemplary damages,' which are compensatory in nature." Plaintiffs' Reply to Defendant's Opposition to Plaintiffs' Supplemental Memorandum in Support of Class Certification of Counts II, III, IV, and V at 39. Accordingly, "those five states would simply not be included in the class." *Id.*

S.Ct. 1625, 75 L.Ed.2d 632 (1983), as support for this proposition. In *Smith*, the Supreme Court found that punitive damages are available under section 1983, Title 42, United States Code (section 1 of the Civil Rights Act of 1871). The Court made this conclusion despite the lack of legislative history on the issue. Justice Brennan, writing for the Court, stated that "[i]n the absence of more specific guidance, we look first to the common law of torts ... with such modification or adaption as might be necessary to carry out the purpose and policy of the statute." The Court went on to review State standards for claims of punitive damages in tort cases in order to develop a Federal standard for such damages. *See id.* at 48, 103 S.Ct. at 1636. It concluded after this review that "a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected right of others." *Id.* at 56, 103 S.Ct. at 1640.

Plaintiffs argue that this Court must apply the reasoning in *Smith* to the present case. They state that the Court must survey the majority position of the many different States on whether and in what circumstances punitive damages may be recovered in a warranty or contract action. If it is concluded, plaintiffs aver, that a majority of States permit recovery of punitive damages, then that should be the adopted Federal standard.

In the alternative, Ford argues that if punitive damages exist at all in Magnuson-Moss actions, the Court must apply the State law which is applicable to each plaintiff. Defendant notes that numerous Federal courts in addressing the punitive damages issue for claims arising under the Act have concluded that, if punitive damages are available at all under Magnuson-Moss, the governing State law applies. *Boelens v. Redman Homes,* 748 F.2d 1058, 1069 (5th Cir.1984); *Saval v. BL, Ltd.,* 710 F.2d 1027, 1033 (4th Cir.1983); *Mackenzie v. Chrysler Corp.,* 607 F.2d 1162, 1166–67 (5th Cir.1979); *In re General Motors Corp.*

*Engine Interchange Litigation,* 594 F.2d at 1132 n. 44; *Schafer v. Chrysler Corp.,* 544 F.Supp. 182, 185 (N.D.Ind.1982); *Lieb v. American Motors Corp.,* 538 F.Supp. 127, 132–33 (S.D.N.Y.1982); *Novosel v. Northway Motor Car Corp.,* 460 F.Supp. 541, 545 (N.D.N.Y.1978). The most cogent explanation for this conclusion was expressed by the court in *Lieb v. American Motors Corp.,* 538 F.Supp. 127. There the court noted:

> The availability of punitive damages under Magnuson-Moss has not been authoritatively determined. Legislative guidance, unfortunately, is entirely lacking. Congress was silent on the scope and measurement of damages under the Act. No court has awarded exemplary damages for Magnuson-Moss violations, and at least one court has refused to allow them....
>
> * * * * * *
>
> In the absence of an explicit Congressional mandate, courts have sought guidance from applicable State breach of warranty laws.

*Id.* at 132–33 (citations omitted).

Ford further argues that if punitive damages are available under the Act, it would be impossible to incorporate all of the various State punitive damages laws into a single class. It argues that the variation in State law would prohibit any conclusion that common issues of law predominate in a punitive damage claim.

The Court disagrees. To determine which law governs the punitive damages issue, a court must examine the choice of law rules of the forum. In the District of Columbia, the courts employ "interest analysis" as its choice of law principle. *See, e.g., Hitchcock v. United States,* 665 F.2d 354, 360 (D.C.Cir.1981). In addition, a court must examine the purpose of punitive damages. "Punitive damages are often referred to as 'exemplary damages.'" Seltzer, Richard A., *Punitive Damages in Mass Tort Litigation: Addressing the Problems of Fairness, Efficiency and Control,* 50 Fordham L.Rev. 37, 42 n. 30

(1983). An award of punitive damages is not really damages at all. "Rather, they are quasi-criminal sanctions imposed to punish defendants and to deter repetition of the offensive conduct by the defendant and the potential wrongdoers." *Id.* at 43 (footnote omitted).

As this Court found in *Keene Corp. v. Insurance Company of North America,* 597 F.Supp. 934 (D.D.C.1984):

> States' interests in compensatory damages differ from those involved in punitive damages.... When the primary purpose of a rule of law is to deter or punish conduct, the States with the most significant interests are those in which the conduct occurred and in which the principal place of business and place of incorporation of defendant are located.... The State of domicile of plaintiff has no interest in imposing punitive damages. "The legitimate interests of [plaintiffs' domiciliary] states, after all, are limited to assuring that the plaintiffs are adequately compensated for their injuries.... Once the plaintiffs are made whole by recovery of the full measure of compensatory damages to which they are entitled under the law of their domiciles, the interests of those States are satisfied." *In Re Air Crash Disaster Near Chicago, Illinois,* 644 F.2d [594] at 613 [ (7th Cir.1981) ]. The place where the injury occurred and where the parties' relationship is centered do not claim as great an interest in the punitive damages issue as in other tort-related issues.

*Id.* at 938–39 (citations omitted). In *In Re "Agent Orange" Product Liability Litigation,* 580 F.Supp. 690 at 705 (1984), Judge Weinstein analyzes the choice of law for punitive damages purposes. He explains that:

> [T]he states of the veterans' domicile do not have an interest in whether or not punitive damages are imposed on the defendants. The legitimate interests of those states are limited to assuring that the plaintiffs are adequately compensated for their injuries and that the proceeds of any award are distributed to the appropriate beneficiaries.... The only jurisdictions concerned with punitive damages are those, including the federal government, with whom the defendants have contacts significant for choice of law purposes. Those contacts include defendants' place of incorporation, principal place of business, location of the plants that manufactured Agent Orange, and the site of any action taken in furtherance of what plaintiffs refer to as "the conspiracy of silence."

*Id.* at 705–06 (citations omitted).

The reasoning of these cases is directly applicable to the present case. Because the purpose of punitive damages is to punish alleged wrongdoings, the jurisdiction with the greatest contacts or the location where the alleged egregious activity took place may be the jurisdiction which this Court should look to in determining the standard for punitive damages. Defendant Ford is a Delaware corporation with its principal place of business located in or near Detroit, Michigan. Second Amended Complaint at ¶ 21. The Court presumes, subject to the parties' assertion otherwise, that the transmissions at issue were designed in Michigan. It further presumes that the willful misconduct and gross negligence alleged in the complaint also took place in Michigan. Accordingly, it is the Court's conclusion that Michigan has the greatest State interest in any imposition of punitive damages.

Although Michigan interests may be superior to those of any other State, the Court cannot ignore the national interests at issue in this case by virtue of the Federal Magnuson-Moss Warranty Act. Because the alleged wrongdoings are violations of Federal law and the parties are before this Court by virtue of the assertion of Federal claims, application of "interest analysis" may compel this Court to conclude that a uniform Federal law should be applied to punitive damages. *See supra* at 406–407.

The Court will decline, at this time, however, to certify a punitive damages class for claims arising under the Act until it has

received sufficient briefing on the question of whether punitive damages are obtainable on claims under the Act and on the issue of which law applies, if punitive damages do, in fact, lie. Because the Court does not believe that failure to resolve the punitive damages certification issue at this time will result in any undue prejudice to the parties or that it will interfere with merits discovery, certification of a punitive damages class is denied at this time.

## NOTICE

Before determining whether a court should grant class certification, it must examine the notice provision of Rule 23. Rule 23(c)(2) provides in pertinent part: "In any class action maintained under subdivision (b)(3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed.R.Civ.P. 23(c)(2).

In addressing the notice question with respect to the "all-owners" class, plaintiffs state that they would be financially unable to provide individual notice to the potentially several million individual class members in the "all-owners difference-in-value damages" group as normally is required by Rule 23(c)(2) as construed by the Supreme Court's opinion in *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732.

The Supreme Court has interpreted Rule 23(c)(2) to mean that "[i]ndividual notice must be sent to all class members whose names and addresses may be ascertained through reasonable effort." *Eisen v. Carlisle & Jacquelin*, 417 U.S. at 173, 94 S.Ct. at 2150. The Supreme Court in *Eisen* further stated that:

[I]ndividual notice to identifiable class members is not a discretionary consideration to be waived in a particular case. It is, rather, an unambiguous requirement of Rule 23. As the Advisory Committee's Note explained, the Rule was intended to insure that the judgment, whether favorable or not, would bind all class members who did not request exclusion from the suit.... Accordingly, each class member who can be identified through reasonable effort must be notified that he may request exclusion from the action and thereby preserve his opportunity to press his claim separately or that he may remain in the class and perhaps participate in the management of the action. There is nothing in Rule 23 to suggest that notice requirements can be tailored to fit the pocketbooks of particular plaintiffs.

*Id.* at 176, 94 S.Ct. at 2152 (footnote omitted).

Plaintiffs argue, however, that the legislative history and purposes of the Act overrule this strict notice requirement in Magnuson-Moss class actions.

I. *The Issue of Individual Notice in Magnuson-Moss Class Actions*

██ As noted *supra* at 386, absent a "direct expression by the Congress" to the contrary, provisions of the Federal Rules of Civil Procedure apply to all civil actions brought in district court. *Califano v. Yamasaki*, 442 U.S. at 700, 99 S.Ct. at 2557. An examination of the legislative history is permissible to find this clear expression if the issue is not addressed within the terms of the statute. *See, e.g., Trbovich v. United Mine Workers of America*, 404 U.S. at 538, 92 S.Ct. at 636.

A few weeks after the Supreme Court issued its opinion in *Eisen* clarifying the requirements of notice in class actions, the House Interstate and Foreign Commerce Committee adopted the House Report to accompany the warranty legislation. *See* House Report, *reprinted in* 1974 U.S.Code Cong. & Ad.News 7702. This report specifically addressed the notice issue that is presently before this Court. The Committee Report states:

The purpose of these jurisdictional provisions is to avoid trivial or insignificant actions being brought as class actions in the federal courts. However, if the conditions of this section are met by a class of consumers damaged by a failure to

comply with a warranty as defined in Title I or a violation of Title I, Section 110(d) should be construed reasonably to authorize the maintenance of a class action. In this context, your Committee would emphasize that this section is remedial in nature and is designed to facilitate relief which would otherwise not be available as a practical matter for individual consumers. *In particular, assuming that other requirements for a class action are met, your Committee does not believe that the requirement of individual · notice to each potential class member should be invoked to preclude a class action where the identification and notification of the class members is not possible after reasonable effort by the plaintiff. In considering whether identification and notification of all members of the class is possible with reasonable effort, the particular circumstances of the plaintiff or plaintiffs should be carefully evaluated by the court, including the question of whether the financial burden of such identification and notification would be likely to deny them relief.*

*Id.* at 7724 (emphasis added). Although the Committee Report did not mention *Eisen* by name, it is plain that it interpreted the Act to afford every reasonable opportunity for a class of consumers to pursue generally small claims, without placing on these individuals the formidable and generally fatal burden of providing individual notice to every potential class member. The Senate-House Conference Committee adopted the House majority's position on class-action issues. *See* Senate Conference Rep. No. 93–1408, 93d Cong., 2d Sess. 27 (1974), *reprinted in* 1974 U.S.Code Cong. & Ad.News 7702, 7755, 7759 ("The conferees adopted the House [class action] provisions.")

During the floor debate prior to the Act's passage, Representative Charles A. Vanik stated that the clear intent of Congress, shown in the House Report adopted by the Conference Committee, was to overrule *Eisen* for the purposes of the Act:

> I appreciate the comments in the committee report relating to notification. The · Supreme Court's arguments in the Eisen decision are based on congressional silence on the issue of notification. The direction provided by *the committee report makes it clear to the courts that it is our legislative intent to make the class action remedy a viable tool for consumers.*

120 Cong.Rec. 31738 (1974) (emphasis added). He went on to quote the relevant portions of the House Committee Report. *Id.* It should be noted that no member of Congress contradicted Representative Vanik's statement. Comments from other Representatives are worth citing as well. Congressman Herman Badillo in Extension of Remarks noted that:

> The bill, by explicitly providing that a consumer may file suit against a supplier who fails to comply with a warranty or service contract and by allowing class action suits *without the requirement of individual notification,* safeguards vital rights for consumers. Because a majority of complaints involve goods of relatively low value, and individual legal costs are prohibitive purchasers cannot usually afford to press their rightful claims.

120 Cong.Rec. 32013 (1974) (extension of remarks) (emphasis added).

 Ford correctly notes that comments by congressmen who are neither sponsors of the bill nor members of the committee who reviewed the legislation, are not entitled to significant weight. *See, e.g., Castaneda-Gonzalez v. Immigration and Naturalization Service,* 564 F.2d 417, 424 (D.C.Cir.1977). It must be noted, however, that these clear expressions as to the intent of the statute are in fact supported by the House Committee Report, as well as by the statements of the Act's co-sponsor, Representative John E. Moss, *see* 120 Cong.Rec. 41406 (1974) ("The report authorizes class actions, provided [certain of the Act's] conditions are met and also where there are at least 100 named plaintiffs *notwithstanding any restrictions on such ac-*

*tions which might exist under general principles of Federal law."* (emphasis added)).

 It is worth noting that in the statement of "separate views," the minority members of the House Committee disagreed with the majority's interpretation of the Act's class-action provisions and read them applicable to the holding in *Eisen.* Separate Views on H.R. 7914, *reprinted in* 1974 U.S.Code Cong. & Ad.News 7747; *see also* 120 Cong.Rec. 41406 (Statement of Rep. Broyhill). Because it was the majority's interpretation of the class-action provisions of the Act which prevailed, these separate views only make clear that Congress was aware of the recent *Eisen* decision and determined that decision not applicable to Magnuson-Moss class actions.

Although no court has directly ruled on the notice question in Magnuson-Moss class actions, two courts in *dictum* have recognized Congress' expression of intent not to apply the strict notice provision of Rule 23(c)(2) to the Act. The United States Court of Appeals for the Seventh Circuit in *In re General Motors Corp. Engine Litigation,* 594 F.2d 1106, observed that: "The legislative history does indicate some dissatisfaction with the Supreme Court's decision in *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156 [94 S.Ct. 2140, 40 L.Ed.2d 732] ... (1974), and perhaps indicates Congress' intention to make Rule 23(c)(2) inapplicable in some class actions maintained under the Magnuson-Moss Act." *Id.* at 1135 n. 50. In *Gorman v. Saf-T-Mate, Inc.,* 513 F.Supp. 1028 (N.D.Ind.1981), the court, in interpreting the remedial purposes of the Act, observed that:

> Congress obviously felt that most aggrieved consumers go without redress because their individual claims are too insignificant to command representation by counsel or to warrant all the other expenses of invoking the judicial process. "Because enforcement of the warranty through the courts is prohibitively expensive, there exists no currently available remedy for consumers to enforce warranty obligations." S.Rep. No. 93–151,

93d Cong., 1st Sess. 7 (1973). Congress was also of the view that existing federal and state court procedural requirements offered too many impediments to the maintenance of consumer class actions. *See* H.R.Rep. No. 93–1107, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Ad.News 7702, 7724 (criticizing requirement of individual notice to potential class members). Accordingly, Congress sought to advance the federal policies expressed in the Warranty Act by fashioning a remedial mechanism for small consumer claims.

*Id.* at 1033.

Given the relevant legislative history, as well as the express purposes of the Act, the Court would plainly frustrate the intent of Congress to "facilitate relief which would not otherwise be available as a practical matter for individual consumers," House Report, *reprinted in* 1974 U.S.Code Cong. & Ad.News at 7724, if it required individual notice to the "all-owners" group.

Ford, in opposing the interpretation of a less restrictive notice requirement under the Act, argues strenuously that if Congress had wished to relax the strict notice requirements as mandated by the Supreme Court's interpretation of Rule 23(c)(2) in *Eisen,* it would have specifically stated such notice variations in the statute itself. This argument highlights the very flaw of the Magnuson-Moss Act. The district court's observation in *Skelton v. General Motors Corp.,* 500 F.Supp. 1181 (N.D.Ill. 1980), *rev'd* 660 F.2d 311 (7th Cir.1981), *cert. denied,* 456 U.S. 974, 102 S.Ct. 2238, 72 L.Ed.2d 848 (1982), aptly summarizes the deficiencies of the Act:

> A literal reading of the Magnuson-Moss Act is only a departure point for giving meaningful content to the statute which has been variously described as "disappointing", "opaque", and a product of "poor drafting". A review of the legislative history gives but limited solace. . . . Both proponents and opponents of an expansive interpretation have cited compelling, to them, legislative history

only dimly related to the language which finally emerged as law.

*Id.* at 1184 (dictum) (footnotes omitted). There is no doubt that "[t]his Act needs some limited judicial first aid in order to be able to accomplish its remedial purposes." *Skelton v. General Motors Corp.*, 660 F.2d 311, 323 (7th Cir.1981) (Wood, J., dissenting) (footnote omitted), *cert. denied*, 456 U.S. 974, 102 S.Ct. 2238, 72 L.Ed.2d 848 (1982). The Court has attempted to effect these purposes by providing a reasonable interpretation of the Act with respect to class certification issues and, more specifically, with respect to the requirement of notice.

## II. *Constitutional Due Process Considerations of Notice*

Ford also argues that anything less than individual notice to each plaintiff in a class action would offend procedural due process.

The Court disagrees with Ford's position. First, it must be noted that the decision in *Eisen* is not based on constitutional due process requirements but simply on a strict interpretation of the language of Rule 23(c)(2) and its demand of individual notice for Rule 23(b)(3) actions. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. at 173, 94 S.Ct. at 2150 ("[T]he import of [the] language [in rule 23(c)(2)] is unmistakable. Individual notice must be sent to all class members whose names and addresses may be ascertained through reasonable effort."). Additionally, not all Rule 23 class actions require individual notice. For example, in subdivisions (b)(1) and (b)(2) class actions there exists no specific requirement to provide individual notice. *E.g., Robinson v. Union Carbide Corp.*, 544 F.2d 1258, 1260 (5th Cir.), *cert. denied*, 434 U.S. 822, 98 S.Ct. 65, 54 L.Ed.2d 78 (1977) (individual notice not required in subdivision (b)(2) class actions); *Larionoff v. United States*, 533 F.2d 1167, 1186 (D.C.Cir.1976) (individual notice not required in subdivi-

sion (b)(1) class actions), *aff'd*, 431 U.S. 864, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977); *see also Sosna v. Iowa*, 419 U.S. 393, 397 n. 4, 95 S.Ct. 553, 556 n. 4, 42 L.Ed.2d 532 (1975) ("the problems associated with a Rule 23(b)(3) class action, which were considered by this Court ... in *Eisen* ... are not present in this case.").

Professors Wright and Miller suggest a reason why notice is required for Rule 23(b)(3) actions but not necessarily for Rule 23(b)(1) or (b)(2) actions:

> [T]he critical problem raising due process concerns in actions under subdivision (b)(3) is not simply notice of the institution of the action, but whether the absent members actually are adequately represented.

> \* \* \* \* \* \*

> In representative actions brought under the other provisions of Rule 23(b), the class generally will be more cohesive.... Similarly, it is less likely that there will be special defenses or issues relating to individual members of a Rule 23(b)(1) or Rule 23(b)(2) class, than in the case of a Rule 23(b)(3) class. This means that there is less reason to be concerned about each member of the class having an opportunity to be present. Thus, in suits under subdivisions (b)(1) or (b)(2), once the court determines that the members are adequately represented as required by Rule 23(a)(4), it is reasonably certain that the named representatives will protect the absent members and give them the functional equivalent of a day in court.

Wright & Miller § 1786 at 143 (footnotes omitted).

The "all-owners" group in this case is in many ways similar to plaintiffs in a (b)(1) or (b)(2) class. First, the claims in the "all-owners" group are virtually identical to each other.[20] Each plaintiff in the "all-owners" group seeks a uniform damage

---

**20.** If there is any variation at all, it exists only in the type of transmission at issue or the type of warranty that was issued for a particular model year. The Court has noted that if these variations prove to be material, appropriate subclasses may be created. *See* Fed.R.Civ.P. 23(c)(4)(B).

amount, *i.e.*, "difference-in-value damages." Further, to prevail in this group and receive an award in damages, plaintiffs need only to provide class-wide proof and will be subject to only class-wide defenses. No individual issues or defenses will be present. Finally, as noted *supra,* these class-wide plaintiffs will be adequately represented both by competent counsel and by class representatives who seek a "difference-in-value" claim in addition to certain incidents claims or by class representatives who endured no "park-to reverse incident" at all, but merely own a Ford vehicle with one of the subject transmissions.

It is important to note here that what is at issue in the "difference-in-value" group amounts to a relatively small claim for each plaintiff. The interests of individually controlling the litigation or of "opting out" of this class to pursue claims on one's own are not significant. A class action provides virtually the only reasonable means by which an individual can assert a "difference-in-value" claim.

Although no court has addressed this question of the due process necessity of individual notice in a Rule 23(b)(3), Magnuson-Moss class action, one commentator has addressed this issue:

> The procedural requirements in the Magnuson-Moss Act, together with those in rule 23, protect the rights of absent Magnuson-Moss Act class members even without an individual notice requirement. First, Magnuson-Moss Act plaintiffs must meet the same rule 23(a) prerequisites to class actions as must all class action plaintiffs. For Magnuson-Moss Act classes, this means that the class members probably will claim under the same warranty, thus ensuring some degree of homogeneity among the class members' claims and interests. Second, the Magnuson-Moss Act requires that would-be class representatives organize the claims of at least 100 named plaintiffs. Further, with so many named plaintiffs, courts can be confident adjudicated claims represent a fair cross-section of the claims of the class as a whole.

Thus, as in subdivision (b)(1) and (b)(2) class actions, numerous *safeguards* protect unnotified Magnuson-Moss Act class members even in the absence of individual notice. In any event, if a court hearing a Magnuson-Moss Act claim believed that particular circumstances necessitated individual notice to protect the individual interest of potential class members, the court could order individual notice. The legislative history of the Magnuson-Moss Act evinces an intent to protect absent members by suspending the individual notice requirement only if such notice would be so onerous that it would effectively terminate the class action and deny plaintiffs relief. This scheme protects the interests of absent class members while permitting injured consumers to enforce their warranty rights free from the potentially prohibitive expense of notifying each identifiable class member individually.

Comment, *The Magnuson-Moss Act Class Action Provisions,* 70 Geo.L.J. at 1418 (footnotes omitted). The Court finds this reasoning compelling. It accordingly sees no procedural due process impediment resulting from plaintiffs' inability to provide individual notice.

For the "all-owners" group plaintiffs have suggested the following notice effort to be implemented:

> [N]otice to all class members who have complained about their park-to-reverse incidents to Ford, NHTSA, state attorneys general, or other government agencies, or private consumer groups.... [N]otice to fleet purchasers of cars equipped with these Ford transmissions.... [P]laintiff could notify insurance companies that pay claims for park-to-reverse incidents.

Plaintiffs' Motion for Class Certification, Appendix A: Plaintiffs Can Properly Notify the Proposed Class of its Certification at 12–13.

The Court will require plaintiffs to submit a detailed proposal as to how they expect to effect notice expanding on what has been proposed above. Further, the

Court will require that plaintiffs effect "individual notice to all members who càn be identified through reasonable effort[,]" Fed.R.Civ.P. 23(c)(2), and to all remaining classes and groups certified in this case.

## CONCLUSION

Although this decision could not possibly address every conceivable issue presented by the parties in the over four hundred pages of briefing and at least 1,500 pages of exhibits that have been filed in support of and in opposition to the motion for class certification, it does focus on the major questions raised by the parties. It must be stressed that although the Court has granted certification of certain specific classes, these classes have been conditionally certified and may be decertified or amended if it becomes apparent that modifications to the class certification order are necessary. *See* Fed.R.Civ.P. 23(c)(1), (c)(4).

The Court also is interested in appointing a Special Master, pursuant to Rule 53 of the Federal Rules of Civil Procedure, to assist the Court in supervising and facilitating discovery, to aid the Court in further narrowing the classes in this action, and to move this case expeditiously to trial. *See Manual for Complex Litigation* §§ 3.10, 3.21. The Court plans to address this issue at the next status conference with the parties.

For the reasons set forth above, the Court conditionally certifies the following classes to pursue claims against Ford for alleged breach of written and implied warranty:

I. *Implied Warranty Incidents*, pursuant to Rule 23(b)(3):

All purchasers or owners (other than for purposes of resale) of 1976–1979 and 1980 pre-design change model year Ford vehicles equipped with an FMX, C–3, C–4, or C–6 automatic transmission seeking recovery of property damages incurred as a result of a Ford park-to-reverse incident, but excluding such persons who purchased such Ford vehicles (a) in States which require the presence of vertical privity to pursue such claims, or

(b) prior to August 21, 1977 and did not experience a park-to-reverse incident prior to November 2, 1977.

II. *Written Warranty Incidents*, pursuant to Rule 23(b)(3):

All purchasers or owners (other than for purposes of resale) of 1976–1979 and 1980 pre-design change model year Ford vehicles equipped with an FMX, C–3, C–4, or C–6 automatic transmission seeking recovery of property damages incurred as a result of a Ford park-to-reverse incident occurring within the 12,000 mile/12 month written warranty period about which they complained to Ford or a Ford dealer within a reasonable time thereafter, but excluding such persons who purchased such Ford vehicles prior to August 21, 1977 and did not experience a park-to-reverse incident prior to November 2, 1977.

III. *All Owners Difference in Value Damages*, pursuant to Rule 23(b)(3):

All owners (other than for purposes of resale) of 1976–1979 and 1980 pre-design change model year Ford vehicles equipped with an FMX, C–3, C–4, or C–6 automatic transmission seeking recovery of damages equal to the difference in value between those transmissions as received and those transmissions as warranted, but excluding such persons who purchased such Ford vehicles prior to August 21, 1977 and did not experience a park-to-reverse incident prior to November 2, 1977.